DOW CHEMICAL COMPANY, Plaintiff,

v.

ROYAL INDEMNITY COMPANY,
Defendant–Appellee,

R. B. Butler, Incorporated,
Defendant–Appellant.

No. 79–2314.

United States Court of Appeals,
Fifth Circuit.
Unit A

Jan. 26, 1981.

Rehearing Denied March 13, 1981.

John C. Hart, Robert M. Wattson, Minneapolis, Minn., for defendant–appellant.

Grambling, Mounce, Sims, Galatzan & Harris, Donald F. Hagans, II, El Paso, Tex., for defendant–appellee.

Before THORNBERRY, RANDALL, and TATE, Circuit Judges.

TATE, Circuit Judge:

Jurisdiction is based on diversity, with Texas substantive law governing. At issue is liability for a loss of some three hundred thousand dollars resulting from the collapse of a structure under construction. The present appeal arises from the dismissal of a cross–action in this suit. By it, R. B. Butler, Incorporated, sued Royal Indemnity Company to recover proceeds on an "all risks" builder's risk insurance policy issued to Butler by Royal that covered the construction of a thin–shell concrete dome, which collapsed before completion. The factual causes of the collapse are essentially undisputed. The district court held that the causes of the collapse were within exclusions from coverage under the policy, and denied Butler recovery.

On Butler's appeal, we reverse the district court's holding that the exclusion clauses apply to the loss sustained by Butler. We do so primarily on our finding that the district court erred as a matter of law in interpreting the exclusion clauses of an "all risks" insurance policy so broadly as to include the present factual causes of the loss and thus to exclude coverage for it.

Before setting forth the facts and issues in more detail, we note that both parties' experts agree that the inadequacy of the welds was the primary cause of the collapse and that, in our view, the central issue of this appeal is whether this inadequacy was due to faulty workmanship by the subcontractor's employees (a covered risk) or was instead due to defects in "design" or in "testing", risks excluded from coverage by clauses 7(g)(1) and 7(g)(3) respectively. Because we find that, within the meaning of the policy, the inadequacy of the welds was due to faulty workmanship rather than to faulty design or testing, we reverse the determination of the trial court that the loss fell within any exclusion clause of Royal's "all risks" policy.

I. *Relevant Facts*

A. *Construction of the Dome*

R. B. Butler, Inc., had contracted with the Public Service Board of the City of El Paso, Texas, to construct four 221–foot thin–shell concrete domes over trickling filter units, one at the Delta Street Sewage Treatment Plant. Butler was the general contractor for this project, and Dow Chemical was the subcontractor directly responsible for the design and construction of these domes.

The domes to be constructed by Dow consisted of two separate structures–a styrofoam form and a concrete shell. The form was made of ten–by–six–inch styrofoam logs which were fused together with ten–gauge reinforcing wire by means of a

rotating fusion head (a machine into which the logs were fed). The styrofoam form was constructed in such a manner as to create a dome structure over which concrete would later be sprayed. The styrofoam structure served only as a form and, after the concrete dome had been sprayed over it, did not play any functional role in the support of the dome.

The following machinery was employed to construct the styrofoam dome: a control point (the center of the trickling filter over which the dome was being built), two beams, a rotating fusion head, and a rider bucket, from which an employee fed the styrofoam logs to the fusion head. (The functioning of the fusion head is later described with more detail.) The boom went in a circular direction and the styrofoam logs were fed into the fusion head and became welded to the other logs. As part of this welding process, there was a continuous feeding of ten–gauge wire reinforcement into each fusion interface (the point at which the two logs would meet).

Upon completion of the styrofoam dome, after a self–furring wire mesh was laid over the styrofoam, concrete was then sprayed over the form. The concrete was applied in sections; and, in order to monitor the depth of each layer of concrete, which was to be three–eighths to one–half inch thick, a device similar to an automobile's "dip stick" could be utilized. By placing the stick in the wet cement, exact thickness could be gauged.

During the construction of the styrofoam dome, a depressed area (a "dimple") appeared on the outer surface. In order to fill the depression to achieve the desired contour, Dow Chemical used "foam–in–place urethane" with mesh reinforcement. In addition, a scaffold was constructed on the inside of the styrofoam dome in order to provide additional support under this dimple.

Royal also points out, as relevant to its arguments of defective design or testing, that the present domes were the largest constructed by Dow, and the first to use 6 × 10 inch styrofoam logs or 10–gauge

welding wire during the welding process. The previous domes successfully built by Dow had used 6 × 8 inch logs and a smaller gauge welding wire, and the largest of the previous domes had been 160′ in diameter as compared with the 221′ diameter in this instance. (The present dome had an arc length of 130′, and it collapsed when concrete had been laid around the styrofoam form around the lower 55 feet or so of its arc length. The arc length measures the circumference surface of the dome from its bottom to its apex; actually, measured vertically, the apex of the present dome was 52′ from the ground.)

## B. *The Causes of the Collapse of the Dome*

Two experts testified, one for Butler and one for Dow. They were in substantial agreement as to the factual causes for the collapse of the dome. The issue before us, as will be more fully developed below, is whether these factual causes may be ascribed, within the meaning of the policy, to faulty workmanship on the part of the subcontractor Dow or its subcontractors, a covered risk; or, instead, to faulty design or to faulty testing within the meaning of exclusion clauses excepting these risks from coverage.

We will accept the description of the causes of the loss as set forth in the appellee Royal's brief, with two slight omissions (indicated and explained by footnotes 1 and 5):

On August 22, 1973, the first of the 221–foot diameter domes collapsed during construction. (C.R. 760). An investigation was conducted by an expert from Dow, Steven Waling. His report, which was introduced upon trial of this cause, indicated that four factors, in combination, caused the collapse. (C.R. 763). One factor was termed a "capacity" and the other three factors were termed "impositions." As the capacity Mr. Waling pointed to (1) incomplete thermal fusion and corresponding reduced tensile capacity of the interface of the foam logs. (C.R. 763). Tests performed following the collapse indicated the tensile stress

and tension were both consistently less than 10 psi (pounds per square inch) in the pass area where the fracture occurred. (Tr. 62). This simply means that the capacity of the welds was approximately 10 psi. The capacity of the welds should have been in the 27 psi range. (Tr. 59, 64). . . . [1] see p. 63.

The next factor given, and the first imposition, was (2) unsymmetrical gravity loading of freshly placed concrete. (C.R. 763). On the day in question concrete was being placed at the 60 and 70 foot level (of a 130 foot arc) in many instances in layers of three–fourths to one and one–half inches. (Tr. 65). This was obviously greater than the specification of three–eighths to one–half inch per layer. (Tr. 65, 66) (C.R. 763). The placement of concrete was also "unsymmetrical," in that it was being placed on only one quadrant of the dome at that particular point in time. (Tr. 65).[2]

The next factor, and the second imposition according to Mr. Waling, was (3) the restraint displacement imposed by the scaffold.[3] As the dome cooled down during the night the depression would come into contact with the scaffold and be restrained. (Tr. 71). The scaffold would not have been present but for the existence of the depression ["dimple"]. (Tr. 71).

The final factor and third imposition was (4) thermal loading and corresponding restraint of the shell form. Dow experienced ambient temperature changes of as much as 50 degrees a day which resulted in significant expansion and contraction of the shell form. (Tr. 73). During the expansion phase the styrofoam dome would be restrained by previously placed concrete. (Tr. 73–76).[4]

Taking into account the additional concrete weight located across from the point of fracture, the restraint displacement of the scaffold support, and the increased stiffness in the area filled with wire reinforced urethane foam (the depression [or "dimple"]), a combination of

1. We omit here Royal's conclusionary summary of certain evidence: "The unusual size of the foam logs utilized together with the design of the fusion head operated to cause the incomplete fusion. (Tr. 63)." We instead summarize the testimony at Tr. 62–63, 58–59, and 81 as showing: Since 10–gauge wire (larger than previously utilized) was being used for the first time, the calibrations of the fusion head should have been adjusted to take into account the use of larger logs and larger wire than previously used. Tr. 58–59. When after the accident the welding was found to have been of deficient tensile capacity, one recommendation was to adjust the fusion head. Tr. 62–63. Subsequent to the collapse, adjustments were made to the calibration of the fusion head for the continued construction of the four domes; in this subsequent successful dome–construction, no further problem in lack of the requisite 27 p.s.i. tensile capacity developed. Tr. 63–64, 81.

2. The concrete was applied in a fashion of concentric rings commencing from the base of dome upward. One ring would be applied, then another (in layers increasing the thickness of the ring), so that, from base to top, there would be more layers (thickness) at the base. This general sequence would be followed until the structural thickness was achieved over the dome surface as a whole.

3. During the construction of the dome, a depressed area (a "dimple") appeared on the sty-

rofoam form. After corrective and cosmetic measures were taken, a scaffold was built on the inside of the dome to give added support to the affected area. The forces being applied against the styrofoam as a result of the scaffolding and the placing of concrete yielded a tensile stress in the range of 12.7, although the welds between the styrofoam logs only had the tensile capacity of 10 p.s.i.

There were conflicting opinions on the cause of the dimple. Butler's expert Waling thought the dimple resulted because it was the hottest spot on the dome, a direct effect of temperature. (Trial p. 72). In the opinion of Clarence Kidwell, Royal's expert, the weakness of the welds caused the depression to develop. (Trial p. 196).

4. El Paso experienced ambient temperature changes of as much as 50 degrees a day during the construction of the dome, which resulted in significant expansion and contraction of the shell form due to the build–up of heat in the styrofoam substance. As a result of the temperature rise, the styrofoam form would expand limited only by the restraint of previously placed concrete. The tensile stress created by this heat-caused expansion was in the range of 11.4 p.s.i. This was counter–balanced by welds having an average tensile capacity of only 10 p.s.i., with some as little as 1–3 p.s.i.

impositions yielding a tensile stress in the range of 12.7 psi would have been present. (Tr. 77). Moreover, dome expansion as a result of temperature rise and the restraint of previously placed concrete would yield a tensile stress in the range of 11.04 psi. (Tr. 123). Thus, any one or all of the impositions in combination with the reduced tensile strength capacity of the welds explains the collapse. *If the thermal fusion of the foam logs had been accomplished according to expectation (in the range of 27 psi) . . .*[5] *the other contributing factors would not have initiated the failure at that point in time.* (Italics supplied by us.)

## C. *The Fusion Head Equipment and the Tensile Capacity of the Welds*

The primary cause of the collapse was thus the failure of the thermal fusion (welds) of the interfaces of the styrofoam logs to have the anticipated capacity (strength) to withstand stress and tension of 27 pounds per square inch (psi). Primarily because of this failure, the dome collapsed; for the styrofoam form was unable, because of this deficiency, to withstand the stress resulting from the contributory causes that otherwise would not have resulted in the dome's collapse. Furthermore, the record reflects that the cause of the inadequate tensile capacity of the welds resulted from the deficient adjustment of the fusion head of the fabrication (spiral generation) equipment supplied by the subcontractor Dow, as a result of which, for one major defect, the calibration–adjustment did not sufficiently embed the ten–gauge wire used in this construction project. See note 1, *supra.*

**5.** We omit the appellee Royal's words "it is possible". As we read the testimony of the experts, they are unqualified in their opinion that if the thermal fusion (welding) of the foam logs had produced the anticipated tensile capacity (27½ p.s.i.), then the dome would have not collapsed despite the contributing causes (due to its lower tensile strength) of unsymmetrical concrete placement, scaffold restraint, and the temperature variation. Tr. 90–91

The tensile capacity (strength factor) of 27 psi was not specified by the design or specifications. Tr. 59. Rather, based on past experience in using the construction process, "[t]he history had been that a statistical expectation would be, as I recall, twenty–seven and a half psi in tension." *Id.*

The thermal fusion (welds) was accomplished through the fusion head of the fabrication equipment. As described by the Kidwell, the defendant's expert, in response to questioning, Tr. 187–88:

Q Okay. Could you explain the function of the fusion head with respect to pressure and heat in the wire and exactly how that would work in welding the logs together?

A Well, a heated metal plate that was called a platen was passed between two styrofoam logs. As it passed through, it groved the styrofoam logs. It fed the wires, and I believe there was four number ten wires on each side, may have been three, but I believe there was four on either side.

This machine fed those wires in, heated the styrofoam logs to a melted condition, just surface melting, then they were pressured, pressed together, and they would then cool and form a homogenous interface.

Q Which we call a weld?

A Which we call a weld, that's right.

In the inspection report following the accident, introduced in evidence as Defendant's Exhibit P, it is indicated that, while this deficient thermal fusion was present in the area of the initial fracture preceding the dome's collapse, it was not present throughout the styrofoam construction.[6]

(Waling, Butler's expert); Tr. 184–85, 222–23 (Kidwell, Royal's expert).

**6.** See Defendant's Exhibit P, p. 3:

Visual inspection showed that the thermal fusion between log passes throughout the area of 6 inch pass height was inadequate. All fracture planes occurred within the fusion interface rather than through the adjacent foam section as is experienced with optimum fusion. Typically, a ⅛ inch maximum gap was found within the fusion interface from the midpoint of the

The same report indicated that, to assure proper welding, some adjustments should be made in the spiral generation equipment utilizing the fusion head.[7] Some (but not all) of these adjustments were made during the subsequent construction; no further problem in deficient thermal fusion was encountered in the subsequent successful construction of the four domes. See note 1, *supra*, and testimony cited therein.

The fusion–head thermal–fusion equipment and process had previously been used by Dow in the successful construction of smaller domes, in which slightly smaller styrofoam logs and wire had been utilized to construct the styrofoam form. The plaintiff's expert (who had been employed by the subcontractor Dow at the time of the accident) testified that he assumed that, for the present construction project, adjustments had been made to the equipment to allow for the additional tensile capacity desired, but that he did not so know from personal knowledge. Tr. 58–59. In this present construction project, during the first few rounds (at the base of the dome) an inspection was made of the adequacy of the welds by cutting into and visually inspecting the interfaces (welds) of the styrofoam logs; since these welds met the expectations of the subcontractor, no further checks (other than consistent visual inspection of the outside–beading of the logs) were made as to the adequacy of the welds during construction of the *upper* rounds of styrofoam bricks comprising the styrofoam dome form. Tr. 60–61.

## II. The "All Risks" Policy and its Exclusion Clauses

Royal had issued to Butler, a general contractor, an "All Risk" Builder's Risk policy, with coverage up to a limit of three million dollars. The insurance contract provided, as to "perils insured": "This policy insures against *all risks* of direct physical loss of or damage to insured property from any external cause *except as provided elsewhere in the policy*." (Italics ours.) The policy covered "buildings or structures, *while in the course of construction*, including additions, attachments, and all permanent machinery, equipment and fixtures, belonging to and constituting a part of said buildings or structures."

Clause 7 lists "perils excluded", providing that the policy "does not insure against [types of losses set forth by exclusion subclauses (a) through (r)]." The district court held that the present loss fell within exclusions referenced by clauses 7(d) (subsidence), 7(g)(1) (defective design), 7(g)(2) (faulty workmanship), 7(g)(3) (deficiency in testing), and 7(h) (latent defects and extreme of temperature). In construing the exclusion clauses of an "all risks" policy so broadly, in our opinion the district court fell into error of law. Before examining clause

---

cross section to the exterior surface. See Figure 2. Inspection showed that the grooves thermally formed within the foam surface to accommodate the # 10 wire, thereby impeding contact of the foam surfaces to be fused.

The centermost portion of the foam shell which remained essentially intact during failure was that portion formed with 4 inch and 3 inch pass height material. Inspection of the welds in that area showed none of the gaps characteristic of the 6 inch pass height area. Fusion surfaces were partially glazed with approximately 50 percent adjacent from tearage.

It was noted that the general failure of the form was along fusion interfaces rather than across pass heights. Our previous experience in laboratory shell testing is that with proper fusion fractures will propagate across several passes in a random manner.

**7.** See Defendant's Exhibit P, p. 8:
1. All concrete must be placed in ½ inch layers as specified and must be applied in a manner which imposes only symmetrical loads on the Styrofoam shell.
2. The spiral generation equipment should be modified in the following manner to insure proper thermal fusion of Styrofoam logs.
a) The slope of the heating platen should be reduced and depth of the groove forming "plows" should be increased.
b) A pressure roll should be inserted to increase the pressure of the incoming log against the heating platen.
c) The temperature distribution across the heating platen should be zoned to allow maximum burn–off at the interior surface and to increase the temperature of the wire reinforcement.
d) A pressure transducer should be installed to continuously monitor boom pressure normal to the weld interface.

by clause the basis of the district court's holding, we preliminarily set forth the legal principles applicable to interpretation of such a policy and its exclusions.

A policy of insurance insuring against "all risks" creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all–risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*, 632 F.2d 424 (5th Cir. 1980); *C. H. Leavell & Co. v. Firemen's Fund Insurance Co.*, 372 F.2d 784 (9th Cir. 1967); *J. Ray McDermott v. Fidelity & Casualty Co.*, 466 F.Supp. 353 (E.D.La.1979) (builder's risk); 13 Couch on Insurance 2d § 48:138 (1965); 5 J. Appleman, Insurance Law and Practice, § 5092 (1970); Annot., Coverage under "all risk" insurance, 88 A.L.R.2d 1122 (1963). Texas jurisprudence is to similar effect: "As a general rule, an 'all risk' policy creates a special type of coverage. Recovery under such a policy is generally allowed for all losses of a fortuitous nature in the absence of fraud or other intentional misconduct of the insured, unless, of course, a policy contains a provision excluding the specific loss from coverage." *Miles v. Royal Indemnity Co.*, 589 S.W.2d 725, 729 (Tex.Civ.App.1979), writ refused n. r. e.[8]

Texas follows the well–settled rule that insurance policies will be interpreted liberally in favor of the insured and ambiguities strictly against the insurer, especially when dealing with exceptions and words of limitation. *Ramsay v. Maryland American General Insurance Company*, 533 S.W.2d 344 (Tex.1976). Furthermore, when the language of the insurance policy is susceptible of more than one reasonable construction, courts should apply that construction which favors the insured and permit recovery. *Glover v. National Insurance Underwriters*, 545 S.W.2d 755 (Tex.1977). See, e. g., *Snyder National Bank v. Westchester Fire Insurance Company*, 425 F.2d 849 (5th Cir. 1970); *Aetna Casualty and Surety Company v. Yates*, 344 F.2d 939 (5th Cir. 1965).

III. *The Application (or Not) of the Exclusion Clauses to the Factual Causes of the Present Loss*

The district court held (Finding of Fact 39) that the failure and collapse of the dome was caused by the following, in accordance with the uncontradicted testimony: (a) Incomplete thermal fusion and corresponding reduced tensile capacity of the interface of the foam logs; (b) Unsymmetrical gravity loading of freshly placed concrete; (c) Restraint and displacements imposed by the presence of a scaffold support; and (d) Thermal loading and corresponding restraint of the shell form. It then held that certain specific (see below) exclusions relate directly to these causes of collapse and preclude coverage (Finding of Fact 40). The exclusion clauses relied upon by the district court as defeating coverage are 7(d) (subsidence), 7(g)(1) (defective design), 7(g)(2) (faulty workmanship), 7(g)(3) (deficiency in testing) and 7(h) (latent defects and extremes of temperature).

Before discussing the findings with respect to each exclusion clause, we here note that the district court primarily fell into error by interpreting clause 7(g)(2) to in-

---

**8.** The usual rule in most jurisdictions is that an "all risks" insured need prove only the loss or damage to the insured property, with the burden then shifting to the insurer to prove that the loss arose from a cause that is excluded under the policy. See, e. g., *Morrison Grain* and Annotation, 88 A.L.R.2d at 1130, *supra*. Texas does not follow this usual "all risk" rule, requiring (as in *non* –"all risk" policies) that, once an insurer pleads an exception to coverage, the plaintiff retains his usual burden of proving that the cause of the loss is within the coverage of the policy. *Hardware Mutual Insurance Company v. Berglund*, 393 S.W.2d 309 (Tex.1965). We here do not reach the application of this special Texas burden of proof rule, nor whether it necessarily applies in a federal action in view of its apparent basis in a special Texas procedural rule. In the case before us, the undisputed evidence shows the factual causes of the damage, and the issue is whether these causes fall within the exclusion clauses properly interpreted.

clude faulty workmanship by a subcontractor and its employees and subcontractors, whereas in the light of the policy as a whole the exclusion applied only to faulty workmanship by employees or others in the direct service of Butler, the insured general contractor, itself. The other findings are in the main elaborations of that misapprehension, although an arguable issue nevertheless exists as to whether the exclusions provided by 7(g)(1) (defective design) or 7(g)(3) (deficiency in testing) apply. In aid of the most convenient disposition of the issues presented, the exclusion clauses will be discussed in the following order: 1. faulty workmanship; 2. subsidence; 3. defective design; 4. deficiency in testing; and 5. latent defects and extremes of temperature.

### 1. *Clause 7(g)(2)–Faulty workmanship:*

■ Provision 7(g)(2) excluded losses resulting from "[f]aulty workmanship or other error, omission or deficiency in respect to the operations of construction, installation repair or erection of any insured property when attributable to or performed by the insured [Butler] or any person or persons in the employment *or service* of the *insured.*" (Italics ours.) Since most of the express factual findings disclose the primary cause of the collapse was the faulty workmanship in the welding process on the part of the subcontractor Dow or its subcontractors, the primary issue for interpretation is whether the subcontractor and those performing for it are in the *"service of the insured"* within the meaning of the policy language excluding coverage for losses resulting from faulty workmanship attributable to "persons in the employment *or service* of the insured."

We first note other policy–exclusion language that, at the least, indicates the intent is ambiguous in this regard. The immediately preceding and succeeding policy exclusions, 7(g)(1) (design defect) and 7(g)(3) (faulty workmanship or deficiency in respect to testing), specify that these exclusions apply "regardless of to whom attributable." The addition of this language to these clauses clearly states exclusion of cov-

erage under these clauses of deficiencies by subcontractors (*as well as* by employees and employee–similar "others" (officers, borrowed employees, etc.) directly in the service of the insured general contractor (Butler) and subject to its direct control). The omission of similar broad language in 7(g)(2) indicates to us a differing intent. We assume this to be to exclude recovery for faulty workmanship *only* when attributable to the *general contractor's* employees or "others" (e. g., officers, borrowed employees) similarly under its immediate direction and control. Furthermore, the language upon which Royal relies would have no purpose if indeed the faulty workmanship *of subcontractors were intended to be* excluded; the provision, then, need only have provided: "faulty workmanship or other error, omission or deficiency in respect to the operations of construction, installation, repair or erection of any insured property."

We are re–enforced in this conclusion by the general purpose of the "all risks" builder's policy, which is intended to insure against all fortuitous losses not caused by the insured's own misconduct or fraud. In purchasing such a policy, a general contractor would contemplate that most, if not all, of the work on the construction project would be accomplished by subcontractors. See Finding of Fact 43. As was recently stated by this court with regard to interpretation of an "all risks" policy: "[A]s a reviewing Court we must view each contract in the light of the setting of the parties and their reasonable expectations as to risks and protection against them, and an insurance policy in such a way as to effectuate its purpose." *Morrison Grain Co., Inc. v. Utica Mutual Ins. Co.,* 632 F.2d at 424, 429. It is reasonable to assume that a primary purpose of purchase of an "all risks" policy by an insured would be to protect against fortuitous loss through fault of the subcontractors through whom the work was done; if subcontractor–fault were entirely excluded as a covered peril, the "all risks" peril expressly insured would become perilously close to a policy insuring *no* risk.

Exclusion of coverage under 7(g)(2) because of faulty workmanship on the part of

the subcontractor's employees was determined by the district court on the basis of an erroneous conclusion of law. Findings of "Fact" Nos. 43, 44, and 45 are to the effect that subcontractors are in the "employment or service" of the insured general contractor, within the meaning of the policy, and that 7(g)(2) unambiguously excludes coverage for loss caused by them. For the reasons previously stated, this is an erroneous conclusion of law, and–in the complete absence of any testimony of faulty workmanship on the part of other than the subcontractor Dow's employees or subcontractors–the exclusion clause does not apply.

With regard to the defective thermal fusion (welds) of the styrofoam logs, which the evidence without dispute shows to have been the primary cause of the collapse, the district court made only two express findings as to causation: "The welding of the styrofoam logs by Dow was not performed in accordance with specifications"[9] (Finding of Fact 50); and: "Dow's failure to produce adequate welds *proximately caused* the failure and the collapse of the dome herein" (Finding of Fact 51). (Italics ours.) The district court also found: "The welds between the interfaces of the styrofoam logs were not produced and performed in a workmanlike manner" (Finding of Fact 53). These findings, it seems to us, are properly legally characterized as faulty workmanship by the subcontractor Dow, a non–excluded peril for which Royal is liable under its "all risks" policy.

### 2. *Clause 7(d)–Subsidence* :

The district court found as a fact that "[t]he failure and collapse of the dome was caused by subsidence in violation of section (d)"[10] of the insurance policy. (Finding of Fact 41.) Our trial brother fell into error of law in this conclusion:

▪ In the first place, even if the collapse of the dome were a "subsidence" within the meaning of the policy, the *primary* or "proximate" cause of the collapse itself was the defective welding done by the faulty workmanship of the subcontractor's employees, a covered risk. The loss was primarily caused by the insured peril (faulty workmanship), not by its consequence, the collapse (if such could be denoted a "subsidence"). Further, where a loss occurs through a cause within the coverage of a policy, the coverage is not defeated because an excluded risk contributes to the loss, *Fidelity Southern Fire Insurance Company v. Crow*, 390 S.W.2d 788 (Tex.Civ.App.1965), writ refused n. r. e.

In the second place, we cannot accept–given application of the accepted principle that an exclusion cause is construed narrowly–Royal's argument that the excluded "subsidence" risk should cover any loss occasioned by any fall whatsoever of insured property. In the more usual sense, a "subsidence" or "to subside" connotes a gradual settling rather than an abrupt collapse. Webster's Third New International Dictionary, p. 2279 (1976); 40 Words & Phrases, verbo "Subsidence," pp. 747–48 (1964), cf., *Employer's Mutual Casualty Company v. Nelson*, 361 S.W.2d 704 (Tex.1962).

### 3. *Clause 7(g)(1)–Defective Design*

In Amended Finding of Fact 42, the district court found: "The failure and collapse

---

**9.** Actually, the evidence reflects that there was no design of specifications calling for the requisite tensile capacity of 27 p.s.i. in the welds of the interfaces of the logs; rather, it was a statistical expectation that the thermal fusion process would produce welds of that tensile strength. Tr. 59. However, the district court rejected an amendment sought to Finding 50 deleting the reference to specifications, finding that the defendant's expert's testimony "reflected that his understanding from Dow Chemical Company was that the tensile capacity of the welds was to be in the range of 27 psi."

**10.** Policy provision 7(d) excludes:

*Loss or damage caused by or resulting from* subsidence, settling, *cracking, shrinkage or expansion of walls*, pavements, floors, roofs, or ceilings unless directly caused by fire, lightning, explosion, wind storm, contact with aircraft or vehicles, vandalism or malicious mischief and then only if and to the extent that such perils are otherwise insured against hereunder.

of the dome was caused by defective design, in violation of Section [7](g)(1)." That clause excludes coverage for loss due to "[e]rror, omission or deficiency in design, specifications, or in any insured property, regardless of to whom attributable."

The district court's finding of fact had originally held defective design because there was insufficient technology available to construct a structurally sound 221–foot thin–shelled dome. This original finding was deleted, however, in view of the uncontroverted evidence that, after the initial collapse, the dome was successfully rebuilt without change in specifications or design. The district court made no other specific finding of fact relating to the alleged deficiency in design.

On appeal, as we apprehend the insurer Royal's argument, it contends that the exclusion applies because of a failure to design proper thermal fusion techniques for the larger logs and wire used in the present construction. We ourselves were also initially concerned that the failure of the design or specifications to provide guidance as to the requisite tensile capacity of the welds might in itself be a defect in the design or specifications.

■ We are not now prepared to say that deficiencies in these regards might never constitute "design" defects. However, the evidence in the present record does not show that specifications as to tensile capacity are a customary feature of proper design; and, indeed, the trial court concluded as a fact that the anticipated tensile capacity of 27 psi was in the nature of a supplied specification (see note 9 *supra*), and that the collapse of the dome was due to the failure of the subcontractor Dow's employees to perform the welding in accordance with these specifications (Finding of Fact 50)– which would constitute a failure of workmanship, not of design.

■ With regard to the malfunctioning (or faulty workmanship in the use of) the fusion head, the evidence indicates that it was due to faulty adjustment of this non–insured property of the subcontractor (see

note 1 *supra*). Again, it seems this deficiency was caused by faulty workmanship rather than by faulty design, even assuming that faulty design of a subcontractor's equipment (such as a hammer or a fusion head) that contributes to defective results could be a defect in design within the meaning of the builder's "all risks" insurance contract.

The appellee Royal also argues that the "dimple" appearing in the styrofoam dome in the course of its construction is evidence of an error of design. However, its own expert concluded that the cause of this malformation was the weakness of the welds (see note 3 *supra*).

We are unable to hold that a design exclusion has been proved within the meaning of the policy, considering also that any ambiguity in the exclusion language is resolved against the insurer and in favor of coverage.

4. *Clause 7(g)(3)–Deficiency in Testing*:

Clause 7(g)(3) of the insurance policy excludes from coverage loss due to "[f]aulty workmanship, error, omission or deficiency in respect to the operation or *testing* of any insured property regardless of to whom attributable." (Italics ours.) In simply concluding the 7(g)(3) exclusion applicable, the district court made no express finding of factual default in the excluded regards.

The appellee Royal's chief argument on appeal is that there was inadequate testing to assure that the styrofoam logs were adequately welded, an especially desirable precaution in this construction project, because of the use therein of larger logs and wire than had formerly been utilized. Royal points out that, when the dome was reconstructed, testing by breaking apart the logs to ascertain the strength of the welds was consistently done during the entire course of construction, as had been done during the 1960's and early 1970's while Dow was developing its dome–construction techniques.

We find some difficulty in ascribing to the exclusion clause an intent to provide a policy defense, *after* a loss has occurred, by

claiming a failure of testing not *previously* specified [11] or known to be required. Considering its ambiguity, the clause might perhaps be interpreted as excluding only losses directly caused to the insured property by the defective testing, for instance; it would thus not exclude fortuitous losses from covered risks (faulty workmanship by the contractor) that may have been *prevented* by adequate testing at some point in the chain of the construction process. The clause is, at the least, ambiguous; for, under the policy, it does not indicate *when* someone has a duty to test, and *to what extent* this testing should be effected.

For present purposes, we will assume arguendo most favorably to Royal (though we doubt that the exclusion should be interpreted so broadly) that the testing–exclusion requires, not only such testing as is specified by the insurance or construction contracts, but also such testing as may be customary in the practice of the insured industry. In this regard, the defendant's expert testified that "you normally set up a testing procedure which will give you a reasonable assurance that the product is acceptable. By that, I mean you may not test every single inch of a weld, but you set up some kind of pattern so that you're relatively well assured that the end results are what you are looking for." Tr. 190–91.

The plaintiff's expert testified that the degree of testing or checking would depend on several factors, with it ultimately being an engineering decision by which the engineer on the project would decide the nature and extent of the testing or checking warranted. Tr. 60, 62. On the present construction contract, during the initial stages of construction, detailed testing was made by breaking the styrofoam logs; when the welds then met the expectations developed by the subcontractor's earlier experience in using the process, thereafter in the contin-

ued construction only visual testing of the outside of the weld line on the logs was made to ascertain that the "beads" of the welds appeared to indicate adequate welds. Tr. 60–61.

The defendant's expert assumed that this testing was insufficient, because on the reconstruction of the dome after the collapse the subcontractor Dow's engineer conducted the extensive testing (by actually breaking open styrofoam logs) at every level of the construction of the dome, as had been customary with Dow during its earlier more experimental development of its dome construction techniques during the sixties and early seventies.

■ On the other hand, there is no evidence that the type of testing actually conducted by the subcontractor Dow during its construction of the (collapsed) dome did not constitute a reasonable engineering decision upon a pattern of testing that, in the words of the defendant's expert, gave "reasonable assurance" that the welds were adequate. Considering the ambiguity of the testing exclusion, we are unable to hold that any evidence in the record as a matter of law supports the application of this exclusion clause under the present circumstances.

5. *Clause 7(h) Loss from latent defect or extreme of temperature.*

■ Provision 7(h) of the insurance policy excluded from coverage "[l]oss or damage caused by or resulting from inherent vice, latent defect, wear and tear, gradual deterioration, rust, corrosion, dampness of atmosphere, wet or dry rot, mold, extreme of temperature, freezing, insects or vermin." [12]

As was noted earlier, Dow experienced temperature change of 50 degrees during construction of the dome. Such changes

11. See, e. g., Plaintiff's Exhibit 1, "Specifications and Contract Documents for Construction of Delta Street Sewage Treatment Plant Improvements," p. 3A–1, which specifies the necessary tests to be performed on the concrete.

12. Royal maintains in its appellate brief (Brief p. 25) that the defective welds constituted a

latent defect. However, within the meaning of a policy insuring against negligence in welding, defective welding is not a "latent defect". *General American Transportation Corp. v. Sun Insurance Office, Ltd.*, 369 F.2d 906, 908 (6th Cir. 1966).

directly affected the expansion and contraction of the styrofoam form, effecting a tensile stress somewhat greater than the tensile capacity.

The district court determined that the proximate cause of the dome's collapse was the ineffective welds. (Finding of Fact 51.) The temperature change may have been a contributing cause of the dome's collapse. However, in an "all risks" policy, the insurer provides protection against all risks, unless otherwise excluded. This policy insured against defective welds resulting from faulty workmanship by the subcontractor, the primary cause of the loss; therefore, coverage is not defeated because a merely contributing cause was an excluded risk. *Fidelity Southern Fire Insurance Company v. Crow*, 390 S.W.2d 788 (Tex.Civ. App.1965), writ refused, n. r. e.; *General American Transp. Corp. v. Sun Ins. Office, Limited*, 369 F.2d 906 (6th Cir. 1966); 5 J. Appleman, *supra*, § 3083.

*Conclusion*

We therefore hold that Butler's claim should not be excluded from coverage under the "all risks" policy issued to it by Royal. The holding of the trial court is therefore REVERSED. While the amount of the loss seems to be uncontested, Royal also raised some additional defenses to payment that the district court did not reach because of its conclusion that the loss was excluded from coverage. Accordingly, the case is REMANDED to the trial court for a determination of damages recoverable by Butler, if any.

REVERSED AND REMANDED.