**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 99-30828
_____

ALTON OCHSNER MEDICAL FOUNDATION,                  Plaintiff-Appellant,

and

BROADMOOR CONSTRUCTION CO.,                  Intervenor-Appellant,

versus

ALLENDALE MUTUAL INSURANCE CO.,                  Defendant-Appellee.
_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

August 2, 2000

Before WIENER and STEWART, Circuit Judges, and ROSENTHAL[*], District
Judge:

WIENER, Circuit Judge:

In this diversity case involving interpretation of an "all-risk" insurance policy under Louisiana law, Plaintiff-Appellant Alton Ochsner Medical Foundation ("Ochsner") appeals the district court's grant of summary judgment to Defendant-Appellee Allendale Mutual Insurance Co. ("Allendale").  We affirm.

I.

Facts and Proceedings

_____

[*] District Judge of the Southern District of Texas, sitting by designation.

In 1991, Ochsner purchased from Allendale an all-risk property insurance policy for a three-year term, beginning June 1, 1991 and ending May 31, 1994. The policy insured several properties, including the Ochsner Clinic in New Orleans. In November 1991, construction was begun on an Atrium Tower ("the Tower") on Ochsner's Jefferson Parish (Louisiana) campus. The Tower was planned as a fifteen-story building, but the initial phase of construction called for only five stories to be built. The Tower's foundation, designed to support the entire fifteen-story building, was completed in July 1992. It consisted of 70 groups of pre-cast concrete piles with each group covered by a reinforced pile cap.

In January 1994, prior to completion of the Tower's initial, five-story phase of construction, Oschner's general contractor, Plaintiff-Intervenor-Appellant Broadmoor Construction Co. ("Broadmoor") informed Ochsner of cracking in three of the pile caps. Ochsner obtained an initial report as well as several follow-up reports from its project engineer, architect, and general contractor. Ochsner also hired Eustis Engineering Company, Inc. and, later, McKee & DeVille Consulting Engineers, Inc. to investigate the cracking and to make recommendations. The studies revealed that nine of the caps exhibited cracking, but concluded that the damage was minor and presented no major structural implications. Meanwhile, Ochsner authorized the completion of the initial five floors. Thereafter, in late 1994 and early 1995, based on the recommendations of the various contractors and

consultants, Ochsner spent $130,000 out-of-pocket for repairs consisting of injecting epoxy grout into the cracks and placing a concrete jacket around one group of the piles. Ochsner did not notify Allendale about the initial cracking or about the investigations and repairs it unilaterally commissioned at its own expense.

In April 1996, Ochsner discovered additional cracking in the pile caps, including renewed cracking in one of the previously repaired caps. Ochsner hired yet another engineering firm, Wiss, Janney, Elstner Associates, Inc. ("Wiss, Janney") to investigate the problem. For the first time, by letter dated August 22, 1996, Ochsner notified Allendale of the cracking. In April 1997, Wiss, Janney completed a report indicating that the cracking was more severe than observed in 1994 and that the capacity of the pile caps to bear the weight of the building had been reduced. According to Wiss, Janney, the cracking resulted from "thermal stresses that developed during early hydration," exacerbated by "time-dependent drying shrinking" and, with respect to at least one cap, "[d]isplacement of the formwork while the concrete was in a plastic or semi-rigid state." Wiss, Janney recommended structural reinforcement of the caps.

Allendale investigated Ochsner's claim, including review of the expert reports and, in a letter dated May 21, 1997, denied coverage on the basis of policy exclusions for (1) "faulty workmanship" and (2) "cracking." Allendale also noted that Ochsner

3

had failed to furnish notice to the insurer within 90 days of loss, as required by the policy. The parties agreed to extend the contractual time limit for the insured to bring suit challenging denial of coverage, at least for those claims not barred by the statute of limitations. Accordingly, Ochsner filed a Complaint for Declaratory Judgment in June 1998, alleging that the cracking in the pile caps "was caused by design error and faulty construction methods occurring during the original construction of the pile caps" and seeking indemnification for "all costs and expenses associated with the repair of the pile caps" supporting the Tower.

Meanwhile, Wiss, Janney returned to the Tower in November 1998 and observed new cracking in ten previously intact pile caps and significant widening of the cracks in the original nine caps. Wiss, Janney concluded that "under existing conditions there exists a material impairment of structural integrity" of the Tower and that "construction of additional floors could pose substantial risks." Ochsner remained in regular contact with Allendale about the deterioration of the foundation. Ochsner maintains that its intention has always been to build the ten additional stories of the Tower.

The parties filed cross-motions for summary judgment based on stipulated facts, and the district court granted Allendale's, concluding that Ochsner failed to comply with the notice and contractual suit limitation provisions of the policy. Alternatively, the district court determined that the alleged loss

4

fell within the two policy exclusions identified by Allendale. After Ochsner's timely notice of appeal, Broadmoor filed a Motion to Extend Ruling on Cross-Motions for Summary Judgment to include it as Intervenor, which the district court granted, thus Broadmoor is also a party to this appeal.

## II.

## Analysis

We review the grant of summary judgment <u>de novo</u> applying the same standard as the district court.[1]

In its alternative holding, the district court determined that two exclusions in the all-risks policy apply and thus Allendale has no duty to indemnify Ochsner. We agree.

The Allendale policy insures Ochsner "against all risks of physical loss or damage, except as hereinafter excluded, to the property described hereinafter." As we observed in another case involving an all-risk policy construed under Louisiana law:

> A policy of insurance insuring against "all risks" creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.[2]

---

[1] <u>Wheeler v. United States</u>, 116 F.3d 749, 754 (5th Cir. 1997) (reviewing district court's disposition of cross-motions for summary judgment decided on stipulated facts).

[2] <u>U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.</u>, 690 F.2d 459, 461 (5th Cir. 1982) (construing Louisiana law and citing <u>Dow Chem. Co. v. Royal Indem. Co.</u>, 635 F.2d 379, 387 (5th Cir. 1981) (construing Texas law)).

Among the specific exclusions in the Allendale policy are two that are relevant to this case. "This policy does not insure against:"

> 3.  faulty workmanship, material, construction, or design from any cause, <u>unless physical damage not excluded by this Policy results</u>, in which event, this Policy will cover only such resulting damage [and]

> 7.  settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, or ceilings; <u>unless physical damage not excluded by this Policy results</u>, in which event, this Policy will cover only such resulting damage (emphasis added to both).

Ochsner does not dispute that the damage to the Tower foundation was the result of "faulty workmanship, material, construction, or design" or that the conditions complained of implicate "cracking . . . of . . . foundations" and that both conditions are expressly excluded. In fact, Ochsner's Complaint for Declaratory Relief itself describes "cracking" and "pile cap cracking" repeatedly, and alleges: "On information and belief, the cracking of the pile caps was caused by <u>design error</u> and <u>faulty construction</u> methods occurring during the original construction. . ." (emphasis added).

Moreover, Ochsner's course of action, from the time it first became aware of the cracking, demonstrates its understanding that the policy exclusions are applicable. Ochsner asserts that, on discovery of the initial, minor cracking in 1994, it "reasonably concluded" that the damage was within the "faulty workmanship" and "cracking" exclusions. Ochsner further contends that, until the middle of 1996, it "had no reason to believe" that the cracking

6

resulted in physical damage that would be covered by the policy, and "when [it] did reasonably form that belief, it provided notice to Allendale." Having made its unilateral determination regarding coverage, Ochsner undertook active management of the situation by (1) obtaining multiple reports from its own project engineer, architect, and general contractor; (2) hiring no fewer than three outside engineering consulting firms to investigate the cracking and to make recommendations; (3) authorizing completion of the first phase of construction; and (4) commissioning and paying for for $130,000 repairs to the cracked caps.

The record contains no indication that Ochsner, in assuming management of the problem, made appropriate demands on its own design professionals and building construction contractors to "make it right," while construction was ongoing. Neither does the record reflect that Ochsner looked to coverage under any other insurance policies it or its various independent design or construction contractors carried. Yet, problems of the kind experienced during the course of the Tower's construction, produced by faulty design or construction or a combination of both, are "usually covered by other insurance."[3] And here, the design professionals' errors and omissions insurance or the general contractor's comprehensive general liability insurer (as well as Builder's Risk, if material) would "usually cover" such faulty design and construction damage.

---

[3] U.S. Indus., 690 F.2d at 461.

7

For approximately two-and-one-half years after the initial cracking was detected, and, for over two years after the expiration of the policy, Ochsner operated as though it had no expectation that the Allendale all-risk would cover the foundation damage.[4]

Nevertheless, Ochsner now contends that the damage to the Tower is covered because the phrase, "unless physical damage not excluded by this Policy results," operates as an exception to the exclusions. Ochsner argues that even if the initial, minor cracking observed in 1994 fell under one or both of the exclusions, the more severe cracking, described in 1997 by Wiss, Janney as "material impairment of structural integrity," constitutes "resulting physical damage" not excluded, i.e., covered by the policy. According to Ochsner, the parties intended to exclude "routine," "minor," or "cosmetic" harm but to include "major" or "extensive" physical damage.

In diametric opposition, Allendale interprets the policy's "unless" clauses to refer to physical damage that is "distinct and separable" from excluded damage, making no quantitative distinction between major and minor damage. According to Allendale, the only

---

[4] Neither party argues, nor did the district court rely on, the "Other Insurance" clause of the policy, but we note its relevance to the issue of Ochsner's apparent failure to seek coverage of its loss from other sources: "The Company shall not be liable for loss under this Policy if at the time of loss there is any other insurance which would attach is this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributory insurance, and then only after all other insurance has been exhausted."

damage to the Tower is that occasioned to the foundation by "faulty workmanship" or "cracking," which is specifically excluded, no matter how severe it may become over time, because no distinct or separate damage has occurred.  As examples of the distinction, Allendale suggests that defective workmanship in installing the wiring of a building would be excluded as "faulty workmanship" but that if the defective wiring resulted in a fire, the fire damage to other parts of the building would be covered as "resulting physical damage."  In such an instance, however, coverage of fire damage would not include the cost of re-wiring the building.  Likewise, "cracking" in the walls of a structure excludes repair of the cracked walls, but if water were to invade the building through the cracks, any water damage would be covered.  In neither example would the cost of re-doing the faulty work itself ⸺ the bad wiring or the cracking ⸺ be covered.  By these analogs, Allendale illustrates the disagreement with Ochsner's analysis: The policy does not cover the foundation problems resulting from the faulty design or construction, or both, which produced the cracking; it would cover unrelated damages such as water damage produced by incursion through the cracks to unrelated elements such as paint or carpets.

Allendale's interpretation is the more logical.  To fall back within coverage as "resulting physical damage," the policy contemplates damage that is different in kind, not merely different in degree.  Ochsner accepts that cracking or defective

9

construction, i.e., minor or "<u>immaterial</u> impairment," of the foundation is excluded from coverage, but then suggests that "<u>material</u> impairment of structural integrity" <u>is</u> covered. We perceive no basis in the policy for this proffered dichotomy. Rather, we conclude that direct harm from cracking or faulty design or construction is excluded (no matter how severe it is) "unless physical damage not excluded by this Policy results," that is, unless damage of a different <u>kind</u> ⎯ a kind that is not excluded ⎯ results. The word "results" supports this interpretation: "Impairment of structural integrity" does not "result" from cracking or faulty construction of the foundation; the cracked foundation <u>is</u> the impaired structural integrity, i.e., the inability of the faulty foundation to support the structure. To put it another way, the minor damage to the foundation does not "cause" the more severe structural impairment. The cracking <u>is</u> the impairment; they are synonymous.

In addition, Allendale's interpretation is consistent with our precedent. On facts similar to the instant case, we applied Louisiana law to determine that the insured's loss fell within the "faulty workmanship" exclusion and thus was uncovered. In that case, <u>U.S. Industries v. Aetna Casualty & Surety Co.</u>,[5] the insured was a general contractor hired to build a steel cylindrical tower, 240 feet high and 15 feet in diameter. The construction process

---

[5] 690 F.2d 459 (5th Cir. 1982).

involved fabricating steel plates, welding the plates together, stacking the plates to the height of the tower, and finally, heat-treating the "skin" of the completed tower to reduce stress. As a result of the contractor's negligence and misjudgment, excessive heating occurred during the final, stress-reduction phase, causing the metal to wrinkle and the tower to lean. The contractor sought coverage from its insurer for the costs of dismantling and rebuilding the tower.

We held that the loss was not covered because the "faulty workmanship" exclusion applied. We construed that exception to mean "a defect in the way some part of the (insured property) is constructed."[6] In other words, "[i]t is the quality of the product which is excluded from coverage, and not damage to the product caused by negligence during the construction process."[7] For example, we noted that if one of the insured's employees ran a truck into the tower during construction, knocking it over, that damage clearly would be covered by the policy.[8] Such an accident would not bear directly on the quality of the product (the tower) but would cause damage to it. By contrast, the wrinkling of the metal skin of the tower as a result of excessive heating damaged

_____

[6] Id. (citing Equitable Fire & Marine Ins. Co. v. Allied Steel Constr. Co., 421 F.2d 512, 514 (10th Cir. 1970)).

[7] Id. (citing City of Barre v. New Hampshire Ins. Co., 396 A.2d 121, 122-23 (Vt. 1978)) (emphasis added).

[8] Id.

11

the quality of the product itself.  Likewise, in the instant case, the cracking of the pile caps is damage to the quality of the product itself; the cracking did not cause damage <u>to</u> the product.[9]

To further explain the distinction between excluded "faulty workmanship" and included "property damage," in <u>U.S. Industries</u> we noted the importance of an event "extraneous" to the construction process bringing about the loss.[10]  All-risk insurance policies generally are viewed as "limiting recovery to those losses in which the cause is 'external to the structure insured,' as opposed to an 'internal' or 'inherent' defect in the item of property which is damaged."[11]  For example, we noted that damage incurred when a pipeline fell into a river as a result of a workman replacing a fitting at one pier without first securing the pipe at another pier was <u>not</u> within the faulty workmanship exclusion, and thus was covered.[12]  Similarly, damage incurred when wooden arches blew down in a strong wind, following the contractor's negligent installation

---

[9] <u>Compare</u> <u>Trinity Indus., Inc. v. Insurance Co. of N. Amer.</u>, 916 F.2d 267, 270 (5th Cir. 1990) (holding that "twist" or misalignment of two modular sections of vessel's hull was excluded "faulty workmanship" because it had not led to any other damage or catastrophe) <u>with</u> <u>Dow Chemical Co. v. Royal Indem. Co.</u>, 635 F.2d 379 (5th Cir. Unit A Jan. 1981) (holding that all risk policy <u>did</u> cover loss when concrete dome collapsed as a result of faulty construction of styrofoam form over which concrete was poured).

[10] 690 F.2d at 462.

[11] COUCH ON INSURANCE 3d, § 148:59, at 148-104 (1998) (citing <u>City of Barre</u>, 396 A.2d 121).

[12] <u>Equitable Fire & Marine Ins. Co.</u>, 421 F.2d 512.

of only two rather than six guy-wires (as the construction plans required) was <u>not</u> within the exclusion.[13]  In both those cases, "[a]lthough errors in workmanship <u>contributed</u> to the causation, the loss or damage . . . resulted fortuitously from events <u>extraneous</u> to the construction process itself — the fall into the river, the gusting of the wind."[14]  By contrast, in the instant case, no extraneous event has occurred; neither has the Tower been damaged by an external force.  Therefore, unlike those examples, the loss is excluded.

As a matter of perspective we must remain mindful that the policy does not cover the costs of "making good" defective construction.[15]  For example, if shoddy plumbing work caused pipes to break and a building to flood, damaging the carpet, the policy would cover the cost of replacing the carpet but not the cost of repairing or replacing the shoddy plumbing job.[16]  This is consistent with <u>U.S. Industries</u>, in which the insured sought

---

[13] <u>City of Barre</u>, 396 A.2d 121.

[14] <u>U.S. Indus.</u>, 690 F.2d at 462 (emphasis added) (citations omitted).

[15] <u>See</u> <u>Trinity Indus.</u>, 916 F.2d at 271 ("[T]he parties did not intend the policy to cover the costs of repairing defective initial construction."); <u>CXY Chems. U.S.A. v. Gerling Global Gen. Ins. Co.</u>, 991 F. Supp. 770, 778 (E.D. La. 1998) (citing policy exclusion for "[t]he cost of making good faulty workmanship").

[16] <u>See</u> <u>Lake Charles Harbor & Terminal Dist. v. Imperial Cas. & Indem. Co.</u>, 857 F.2d 286, 287 (5th Cir. 1988) (no dispute that policy excluded coverage for costs of replacing and repairing worn cable that broke and sent heavy shuttle crashing into shiploader but dispute regarding coverage for resulting damage to loader).

13

indemnity solely for the costs of re-doing the faulty construction — dismantling and rebuilding the metal tower — which we held was excluded. In like manner, the only costs for which Ochsner seeks indemnity is the cost of correcting the faulty construction of the Tower's foundation: In its declaratory judgment complaint, Ochsner sought only the "costs and expenses associated with the repair of the pile caps." The policy specifically excludes such costs from coverage. The proof of this logic lies in the observation that the only cost that would be associated with restoration of the structural integrity of the Tower is the cost of repairing the design and construction deficiencies of the foundation. Therefore, we conclude that Ochsner has failed to identify any "resulting damage" "not excluded by this Policy" that would allow it to avoid the express exclusions for "cracking" and "faulty workmanship . . . or design." We affirm the district court's conclusion that the claim is not covered.

In closing, we take note of the Catch-22 in which Ochsner placed itself by attempting to identify a loss that (1) occurred during the policy period and (2) is not within the express exclusions. The Allendale policy declares the policy period was to be for three years, from June 1, 1991 to May 31, 1994: "[T]he insurer's obligation to pay is contingent on a covered loss occurring during the policy period."[17] To satisfy this requirement,

---

[17] COUCH ON INSURANCE 3d, § 102:2, at 101-9 to -10 (1998) (noting principle is equally applicable to all-risks policies); see Hoffman

14

Ochsner points to the initial, minor cracking in 1994, which it boldly admits falls within the exclusions. The policy also requires that "[t]he Insured shall give immediate written notice to this Company of any loss" and "within (90) ninety days after the loss . . . the Insured shall render to this Company a proof of loss." To satisfy this requirement, Ochsner points to the rediscovered, more severe cracking in 1996 and its August 1996 notice to Allendale. Yet these are not two separate events: The cracking began in 1994 (or earlier) and progressed alluvially into 1997 and beyond. But it was all the same cracking caused by the same fault or faults in design or workmanship during construction. As we have already concluded that, on the facts before us, all of the damage <u>to date</u> falls within the specific policy exclusions,[18] we need not and therefore do not address and resolve the time of loss and notice of claim discrepancy.

III.

Conclusion

We affirm the district court's grant of summary judgment to Allendale, adopting its alternative holding that (1) two express

_____

<u>v. State Farm Fire & Cas. Co.</u>, 16 Cal. Rptr. 2d 809, 810 (Cal. Ct. App. 1993) (holding that property owners could not recover under all-risk policy unless damage occurred during policy period).

[18] We disagree, however, with the district court's holding that actual or imminent collapse of the Tower must occur before the loss would be covered. Requiring Ochsner to build ten additional "doomed" stories to gain insurance coverage would establish an irrational incentive structure.

15

policy exclusions, for "cracking . . . of foundation" and "faulty workmanship, material, construction, or design" apply, and (2) Ochsner failed to identify separate and distinct "physical damage not excluded by the Policy." Ochsner's understandable efforts to create a separate non-excluded damage from the phrase, "material impairment of structural integrity," which appeared in a 1997 report prepared by an engineering consultant, fails. The diminished structural integrity is indistinguishable from the diminished capacity of the foundation which results directly and only from deficient design or construction or a combination of both. Because the policy's exclusions clearly preclude indemnity by Allendale for such design and construction damage to the foundation, it owes Ochsner no indemnity.

AFFIRMED

16