2012 COA 178

**COLORADO POOL SYSTEMS, INC.; and Patrick Kitowski, Plaintiffs–Appellants,**

v.

**SCOTTSDALE INSURANCE COMPANY, a foreign corporation; GAB Robbins North America, Inc., a Delaware corporation; and Don Hansen, Defendants–Appellees.**

**No. 10CA2638.**

Colorado Court of Appeals, Div. IV.

Oct. 25, 2012.

Rehearing Denied Nov. 21, 2012.*

---

* Russel, J., did not participate.

Walter H. Sargent, P.C., Walter H. Sargent, Colorado Springs, Colorado; Cook & Associates, P.C., Stephen H. Cook, Boulder, Colorado, for Plaintiffs–Appellants.

Senter Goldfarb & Rice, L.L.C., Arthur J. Kutzer, Joel A. Palmer, Denver, Colorado, for Defendant–Appellee, Scottsdale Insurance Company.

White and Steele, P.C., James M. Dieterich, Laura E. David Fuller, Denver, Colorado, for Defendants–Appellees, GAB Robbins North America, Inc.; and Don Hansen.

Holley, Albertson & Polk, P.C., Dennis B. Polk, Eric E. Torgersen, Lakewood, Colorado, for Amicus Curiae, Colorado Association of Home Builders.

The Witt Law Firm, Jesse Howard Witt, Marci M. Achenbach, Denver, Colorado, for Amicus Curiae, The Colorado Trial Lawyers Association.

Sullan2, Sandgrund & Perczak, P.C., Ronald M. Sandgrund, Leslie A. Tuft, Denver, Colorado, for Amicus Curiae, Homeowners Against Deficient Dwellings (HADD).

Opinion by Judge RUSSEL.

¶ 1 Plaintiffs, Colorado Pool Systems, Inc., and its owner, Patrick Kitowski, appeal from summary judgments in favor of defendants, Scottsdale Insurance Company, GAB Robbins North America, Inc., and GAB's employee, Don Hansen. We reverse and remand for further proceedings.

## I. Background

¶ 2 The main issue here is whether a builder is covered, under a commercial general liability (CGL) policy, for damages that arose from the builder's own faulty workmanship. We conclude that, for certain damages, unless the policy contains specific exclusions, the answer is yes.

### A. The Defective Pool

¶ 3 In 2005, Colorado Pool agreed to build a swimming pool at Founders Village Pool and Community Center. Colorado Pool hired subcontractors to construct the pool's concrete shell. To build the shell, workers poured concrete around a rebar frame that was located inside the excavation.

¶ 4 After the shell was poured, an inspector noticed that some rebar was too close to the surface. Colorado Pool proposed various remedial measures, but Founders rejected those.

¶ 5 Founders turned to its general contractor, White Construction Group, and demanded that the pool be removed and replaced. White then passed the demand to Colorado Pool. White stated that, if Colorado Pool did not promptly satisfy its obligations, White would have the pool replaced at Colorado Pool's expense.

¶ 6 During this time, Colorado Pool held a CGL policy with Scottsdale. Consequently, when Founders and White demanded that the pool be replaced, Colorado Pool sought legal advice about its insurance coverage. Colorado Pool also notified Scottsdale of the Founders claim, seeking pre-approval for the cost of demolishing and replacing the pool. Scottsdale's claims adjuster, GAB, assigned the claim to Don Hansen.

¶ 7 Hansen visited the worksite and met with Colorado Pool's attorney, White's project manager, and Kitowski. According to plaintiffs, Hansen stated that the CGL policy would cover losses associated with demolishing and replacing the pool.

¶ 8 Demolition then began. Colorado Pool and Kitowski paid for the work, expecting to be reimbursed. But the reimbursement never came, and they soon ran out of money. White completed the project, billing its costs against Colorado Pool's account.

¶ 9 Almost six weeks after being notified of Colorado Pool's claim, Scottsdale denied coverage. Scottsdale refused to reimburse Colorado Pool or Kitowski for the cost of demolishing and replacing the pool, and it declared that it had no duty to defend them in any action on the claim.

### B. The Arbitration

¶ 10 In 2006, White initiated arbitration against Colorado Pool. After some negotiation, Colorado Pool confessed liability in the amount of $133,500. Colorado Pool satisfied that judgment.

### C. The Lawsuit Here

¶ 11 In 2008, Colorado Pool and Kitowski sued Scottsdale, GAB, and Hansen. (For the sake of simplicity, when discussing events that concern GAB and Hansen equally, we will refer to these two defendants as GAB/Hansen.)

¶ 12 Plaintiffs asserted the following claims: (1) under the terms of the contract, Scottsdale had a duty to defend and indemnify on the underlying insurance claim; (2) Scottsdale was estopped from denying coverage because plaintiffs had relied on statements made by Hansen, acting as Scottsdale's claims adjustor; (3) Scottsdale had acted in bad faith in denying the insurance

claim; and (4) GAB/Hansen was liable for negligently misrepresenting that the claim would be covered.

¶ 13 Scottsdale and GAB/Hansen each sought summary judgment:

1. Scottsdale asserted these arguments: (1) there is no coverage under the policy because faulty workmanship is not an "occurrence" and because "property damage" does not include the cost of replacing defective work; (2) the insurance claim is defeated by certain policy exclusions; (3) Scottsdale cannot be estopped from denying coverage because plaintiffs did not reasonably rely on Hansen's statements; (4) plaintiffs' bad faith claim fails because it is time barred and because Scottsdale's actions were reasonable.

2. GAB/Hansen asserted these arguments: (1) if plaintiffs relied on Hansen's statements, their reliance was not justifiable; (2) plaintiffs incurred no damages in relying on the statements; and (3) the negligent misrepresentation claim was time barred.

¶ 14 The trial court denied both motions. It found genuine issues of material fact about the existence and extent of coverage, the date on which plaintiffs' claims accrued, and the reasonableness of any reliance on Hansen's statements.

¶ 15 Later, plaintiffs directed the court's attention to the newly enacted Construction Professional Commercial Liability Insurance Act (Builders Insurance Act), which is now codified at section 13–20–808, C.R.S.2012. Relying on this statute, plaintiffs moved for summary judgment on the coverage issue.

¶ 16 Scottsdale responded to plaintiffs' request and renewed its motion for summary judgment. It argued that the statute cannot be retroactively applied here. It also argued, relying on an affidavit from Colorado Pool's project supervisor, that plaintiffs had expected the pool to be defective.

¶ 17 The court granted Scottsdale's renewed motion. It ruled that the Builders Insurance Act does not apply retroactively and that Scottsdale's policy did not cover the claimed damages. (The court did not ad-dress plaintiffs' estoppel claim, presumably because Scottsdale did not challenge that claim in its motion.)

¶ 18 Thereafter, GAB/Hansen filed a renewed motion for summary judgment. GAB/Hansen argued that, in the absence of coverage under the policy, plaintiffs could not have justifiably relied on Hansen's alleged statements. The court granted that motion, too.

¶ 19 Plaintiffs now challenge both judgments. We first address the court's judgment in favor of Scottsdale. We then address the judgment in favor of GAB/Hansen.

## II. Standard of Review

¶ 20 We review both judgments de novo. We will affirm only if there is no genuine issue of material fact and if defendants are entitled to judgment as a matter of law. *See West Elk Ranch, L.L.C. v. United States,* 65 P.3d 479, 481 (Colo.2002).

## III. Summary Judgment for Scottsdale

¶ 21 Plaintiffs contend that the court erred in ruling that the alleged damage did not arise from an "accident," as that term is used in the policy. To evaluate that contention, we must identify both the pertinent policy language and the principles that govern its interpretation. The latter inquiry is complicated by a dispute about the source of the governing law: plaintiffs assert that the policy must be interpreted under the Builders Insurance Act, while Scottsdale maintains that the interpretation is governed by common law principles.

¶ 22 We agree with Scottsdale that the matter must be decided under the common law. However, we conclude that the court interpreted the policy incorrectly, and for this reason we reverse the court's summary judgment and remand for further proceedings on plaintiffs' claims.

### A. The Policy Language

¶ 23 Standard CGL policy forms are developed and published by the Insurance Services Office, Inc. *See French v. Assurance Co.,* 448 F.3d 693, 700 (4th Cir.2006). These forms are widely used in the insurance indus-

try. As the needs of the industry change, the Insurance Services Office revises the forms. A major revision to the CGL form was published in 1986. *Id.*

¶ 24 Here, the CGL policy tracks the standard 1986 version:

1. Subject to limited exceptions, the policy covers "property damage" that is "caused by an 'occurrence' that takes place in the 'coverage territory' ... during the policy period."

2. "Property damage" is defined as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured."

3. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (The policy does not define "accident.")

### B. The Builders Insurance Act

¶ 25 Section 13–20–808 was enacted in response to *General Security Indemnity Co. v. Mountain States Mutual Casualty Co.*, 205 P.3d 529 (Colo.App.2009). In that case, a division of this court held that faulty workmanship, standing alone, is not an "accident."

¶ 26 In enacting the statute, the legislature declared that *General Security* "does not properly consider a construction professional's reasonable expectation that an insurer would defend the construction professional against an action or notice of claim." § 13–20–808(1)(b)(III). The legislature sought to correct this deficiency by creating an interpretive presumption:

(3) In interpreting a liability insurance policy issued to a construction professional, a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other work, is an accident unless the property damage is intended and expected by the insured. Nothing in this subsection (3):

(a) Requires coverage for damage to an insured's own work unless otherwise provided in the insurance policy; or

(b) Creates insurance coverage that is not included in the insurance policy.

§ 13–20–808(3)(a)–(b).

¶ 27 The statute's effect is clear enough. If we were to apply it, we would presume that the CGL policy covered damage that resulted from Colorado Pool's defective workmanship, including the cost of demolishing and replacing the pool. (It fairly appears that plaintiffs did not intend and expect that result.)

¶ 28 But the statute's applicability is uncertain because the pertinent events—the negotiation and execution of the policy, the faulty workmanship and resulting damage, and the denial of coverage—all occurred before the statute's effective date. We therefore must determine, as a threshold matter, whether the statute applies retroactively.

¶ 29 Our determination depends on the answers to two questions: (1) Did the legislature intend the statute to be retroactive? (2) If so, would retroactive application of the statute be unconstitutionally retrospective? *See City of Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 444 (Colo.2000). We answer "yes" to both questions.

### 1. Legislative Intent

¶ 30 Courts presume that statutes apply prospectively. *See* § 2–4–202, C.R.S. 2012; *In re Estate of DeWitt*, 54 P.3d 849, 854 (Colo.2002). But this presumption may be overcome by clear evidence of a contrary intent. *See DeWitt*, 54 P.3d at 854 (legislative intent must be clear, but express language is not required).

¶ 31 Here, the presumption is overcome. In enacting the legislation, the general assembly stated that the act "applies to all insurance policies *currently in existence* or issued on or after the effective date of this act." Ch. 253, sec. 3, 2010 Colo. Sess. Laws 1128 (emphasis added). And in the statute itself, the general assembly stated that the act is intended to guide *pending* actions, on policies that *have been* issued:

For the purposes of guiding pending and future actions interpreting liability insur-

ance policies issued to construction professionals, what has been and continues to be the policy of Colorado is hereby clarified and confirmed in the interpretation of insurance policies that have been and may be issued to construction professionals.

§ 13–20–808(1)(b)(IV).

¶ 32 A statute can apply to policies "currently in existence," and can guide "pending" actions on policies that "have been issued," only if it operates retroactively. *See Ficarra v. Dep't of Regulatory Agencies,* 849 P.2d 6, 11 (Colo.1993) (a statute is retroactive if it "operates on transactions that have already occurred or rights and obligations that existed before its effective date").

¶ 33 We therefore conclude, contrary to the views expressed by others,[1] that the Builders Insurance Act was intended to apply retroactively.

### 2. Retrospective Operation

■ ¶ 34 The Colorado Constitution forbids any law that is "retrospective in its operation." Colo. Const. art. II, § 11. A statute is unconstitutionally retrospective if it would impair vested rights or create a new obligation, impose a new duty, or attach a new disability to transactions that have already occurred. *DeWitt,* 54 P.3d at 854.

■ ¶ 35 Whether a statute would operate retrospectively is an "as applied" inquiry. *See Shell Western E & P, Inc. v. Dolores Cnty. Bd. of Comm'rs,* 948 P.2d 1002, 1012 (Colo.1997) (the second step in a retroactivity analysis is to determine "whether the statute, as applied, violates the constitutional prohibition"). We therefore must determine whether the Builders Insurance Act would be impermissibly retrospective if applied here—a case in which all pertinent transactions occurred, and the policy period expired, before the statute was enacted.

¶ 36 Like the trial court, we conclude that a retroactive application of the statute would be impermissibly retrospective.

¶ 37 Scottsdale agreed to provide, and Colorado Pool agreed to buy, certain insurance coverage at a certain price. That agreement is enforceable. *See Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1262 (Colo.2000) (contract law is intended to enforce the parties' expectancy interests). And the substance of that agreement—the rights and duties that each party acquired under the contract—depends on the reasonable meaning of the policy language when the agreement was executed. *See Dravo Corp. v. United States,* 480 F.2d 1331, 1332 (Ct.Cl. 1973) (the objective in interpreting a contract is to determine the intent of the parties, giving contract language the meaning that would be understood by a reasonably intelligent person acquainted with the circumstances when the contract was formed).

¶ 38 If applied here, the Builders Insurance Act would retroactively change the coverage provided under the CGL policy.[2] And that change, in turn, would retroactively alter the reasonableness of Scottsdale's actions in refusing to defend and indemnify Colorado Pool. That sort of change is unconstitutional. *See Landgraf v. USI Film Products,* 511 U.S. 244, 270, 114 S.Ct. 1483, 114 S.Ct. 1483 (1994) (a statute cannot be applied retroactively if it imposes "new legal consequences [on] events completed before its enactment"); *City of Golden v. Parker,* 138 P.3d 285, 290 (Colo.2006) (retroactive application of a statute is prohibited where "the reasonable expectations and substantial reliance of a party

---

1. *See TCD, Inc. v. Am. Family Mut. Insurance Co.,* 2012 COA 65, ¶ 24, 296 P.3d 255 (concluding that the statutory language does not overcome the presumption of prospective application); *see also Greystone Constr. Inc. v. Nat'l Fire & Marine Ins. Co.,* 661 F.3d 1272, 1280 (10th Cir.2011) (same).

2. How much change would occur under the statute? That depends on how the CGL policy is interpreted at common law. And the parties disagree on that issue, as we discuss in Part III.

C. But at this stage, we need only observe that the statute would enlarge coverage beyond that which exists under the broadest common law interpretation. *Compare* § 13–20–808(3) (faulty work is presumed an accident unless the damage is "intended and expected"), *with Hoang v. Monterra Homes (Powderhorn) LLC,* 129 P.3d 1028, 1034 (Colo.App.2005) (faulty work was properly declared an accident where the damage was not "intended or expected"), *rev'd on other grounds sub nom. Hoang v. Assurance Co.,* 149 P.3d 798 (Colo.2007).

vested prior to the enactment of the statute").

## C. Common Law

¶ 39 Having concluded that section 13–20–808 does not apply, we must determine the meaning of the policy under the common law.

### 1. The Parties' Tests

¶ 40 As noted, the policy does not define "accident." We therefore give this term its plain and ordinary meaning. *See Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). And we conclude that the term is ambiguous. In this context, "accident" can be read either narrowly, to include only events that occur by chance, or broadly, to include any unintended event. *See Webster's Third New International Dictionary* 11 (2002) ("accident" includes "an event or condition occurring by chance" and "lack of intention or necessity").

¶ 41 Because the term is ambiguous, it must be construed broadly, in favor of the insured. *See Thompson*, 84 P.3d at 502. But that does not mean that we must adopt plaintiffs' views wholesale. On the contrary, we must ensure that any interpretation of "accident" comports with the policy's remaining provisions. *See Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo.2003) ("Courts should read the provisions of the policy as a whole, rather than reading them in isolation."); *Holland v. Bd. of County Comm'rs*, 883 P.2d 500, 505 (Colo. App.1994) (in construing contracts, courts must give effect to every provision, if possible).

¶ 42 We conclude that the parties' interpretations fail to account for other policy provisions:

1. Relying on *Hoang v. Monterra Homes (Powderhorn) LLC*, 129 P.3d 1028, 1034 (Colo.App.2005), *rev'd on other grounds sub nom. Hoang v. Assurance Co.*, 149 P.3d 798 (Colo.2007), plaintiffs argue that an insured's faulty work is an accident if the insured did not expect or intend its actions to result in property damage. We reject this approach because it renders superfluous the "Expected or Intended" exclusion contained in the CGL policy. *See General Security*, 205 P.3d at 535 (rejecting *Hoang* because, among other things, it would render superfluous the provision that excludes coverage for expected or intended damage).

2. Relying on *General Security*, 205 P.3d at 535, defendants argue that an insured's faulty work is an accident only if it results in property damage to a third party. We reject this approach because it renders superfluous the exclusion for "Damage to Your Work." *See Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (10th Cir.2011) (by foreclosing coverage for damage to nondefective property caused by the work of a subcontractor, the *General Security* test "renders the 'your work' exclusion a phantom").

¶ 43 We therefore reject the parties' views and instead consider the test set forth in *Greystone Construction*, 661 F.3d 1272.

¶ 44 In *Greystone*, homeowners sued their builder for damage caused by expansive soil. The homeowners alleged that faulty workmanship led to defects in the soil-drainage and structural elements of the homes, and they further alleged that those defects caused damage to other parts of the homes. *Id.* at 1276.

¶ 45 Applying Colorado law, the Tenth Circuit held that "injuries flowing from improper or faulty workmanship constitute an 'occurrence' so long as the resulting damage is to nondefective property, and is caused without expectation or foresight." *Id.* at 1284. The court stated that this rule applies whether the resulting damage is to the insured's work or to a third party's work. *Id.* at 1286–87.

¶ 46 In reaching its conclusion, the court recognized a distinction between defective and nondefective work product. Relying on *French*, 448 F.3d 693, the court explained that "[t]he obligation to repair defective work is neither unexpected nor unforeseen under the terms of the construction contract or the CGL policies." *Id.* at 1286. Accordingly, the

court ruled that damage to the defective soil-drainage and structural elements of the homes was not covered, whereas damage to the nondefective elements of the homes was covered. *Id.*

¶ 47 We conclude that the *Greystone* test gives effect both to a broad interpretation of "accident" and to the policy's other provisions. We therefore apply that test here.

### D. Application

¶ 48 Plaintiffs assert that the Scottsdale policy covers two types of property damage: (1) the cost of demolishing and replacing the defective pool; and (2) consequential, or "rip and tear," damage to nondefective third-party work, which occurred during the replacement project. We conclude that some of this damage is covered:

1. *Replacement of the defective pool.* Applying the *Greystone* test, we conclude that plaintiffs' policy does not cover damage incurred in demolishing and replacing the pool itself. This damage resulted solely from plaintiffs' obligation—necessarily expected—to replace defective work product. *See id.*

2. *Consequential damage.* We further conclude that rip and tear damage to nondefective third-party work (including damage to a deck, sidewalk, retaining wall, and electrical conduits) is covered. Under the Greystone test, this damage is the result of an "accident." *See also Dewitt Constr. Inc. v. Charter Oak Fire Ins. Co.,* 307 F.3d 1127, 1134 (9th Cir.2002) (finding coverage for damage to other work caused during repair of insured's defective work); *Standard Fire Ins. Co. v. Chester O'Donley & Associates, Inc.,* 972 S.W.2d 1, 12 (Tenn.Ct.App.1998) (subcontractor covered for damage to other work incurred during removal of defective HVAC system); *but see Desert Mountain Properties Ltd. P'ship v. Liberty Mut. Fire Ins. Co.,* [225 Ariz. 194,] 236 P.3d 421, 441–42 (Ariz.Ct. App.2010) (no coverage for damage to nondefective property caused by the repair of defective work), *aff'd,* [226 Ariz. 419,] 250 P.3d 196 (Ariz.2011).

¶ 49 For this reason, we reverse the trial court's summary judgment in favor of Scottsdale, and we remand for further proceedings on plaintiffs' claims.

### E. Issues Not Addressed

¶ 50 We note two additional issues that the court should consider on remand.

#### 1. Exclusions

¶ 51 Scottsdale argues that policy exclusions (a), (j)(5), (j)(6), and (m) defeat plaintiffs' entire claim for coverage (including consequential damage). We decline to address that argument because the trial court did not consider the exclusions in its order granting summary judgment. *See Greystone,* 661 F.3d at 1290 ("[T]he better practice on issues raised below but not ruled on by the district court is to leave the matter to the district court in the first instance.") (quoting *Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.,* 593 F.3d 1188, 1198 (10th Cir.2010)). Scottsdale may reassert this argument on remand.

#### 2. Estoppel

¶ 52 Plaintiffs argue that the court erred in granting summary judgment without first evaluating their claim for equitable estoppel. Because we have reversed the trial court's summary judgment, we need not consider this argument. We conclude that this matter too should be considered by the trial court in the first instance. *See Greystone,* 661 F.3d at 1290.

### IV. Summary Judgment for GAB/Hansen

¶ 53 We now review the court's resolution of plaintiffs' negligent misrepresentation claim against GAB/Hansen. This claim is based on statements that Hansen allegedly made when he met with plaintiffs. We conclude that the court erred in granting summary judgment on this claim and accordingly reverse the judgment.

### A. Additional Facts

¶ 54 According to plaintiffs, Hansen made several material representations when he met with them at the worksite:

- Hansen said that he had authority to make coverage decisions under the Scottsdale policy.

- When asked about the expense of demolishing and replacing the pool, Hansen answered that there was coverage.

- When asked about consequential rip and tear damages, Hansen said that those items would be covered too.

- When Kitowski told Hansen that the work "was going to be probably at least around half a million dollars," Hansen responded, "[G]o ahead and do what you have to do," reiterating that the policy provided $1 million in coverage.

¶ 55 Thereafter, according to plaintiffs, they undertook the demolition and replacement. When Scottsdale first informed Colorado Pool that the claim was denied, substantial work had already been completed.

¶ 56 Kitowski testified that, but for Hansen's assurances, he would have continued to negotiate instead of agreeing to demolish and replace the pool. And Colorado Pool's attorney wrote to Scottsdale that, in reliance on Hansen's assurances, Kitowski had used personal funds and credit for a significant part of the costs of demolition and replacement.

¶ 57 In addition, shortly before the trial court's ruling, Kitowski submitted an affidavit, which contained the following statements:

- "[T]he owners of Founder's Village ... took the position that they wanted the entire pool demolished and rebuilt. While I agreed that repairs were needed, I disagreed that the pool needed to be demolished and rebuilt."

- "An alternative to a complete demolition and rebuild would have been to do a repair [of] the section of the pool addressing the owner's issues.... I believe this would have been effective."

- "When the defendants' representative said that there was sufficient insurance coverage to cover the costs of a demolition and rebuild, and that it was covered, the approach of the alternative repair became a secondary issue.... The demolition of the pool started that day."

### B. Governing Principles

¶ 58 Negligent misrepresentation occurs when an actor "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions." *Barfield v. Hall Realty, Inc.,* 232 P.3d 286, 290 (Colo.App.2010) (quoting *Mullen v. Allstate Ins. Co.,* 232 P.3d 168, 174 (Colo.App.2009)). Such an actor is liable for pecuniary losses caused by "justifiable reliance" on his information if he "fails to exercise reasonable care or competence in obtaining or communicating the information." *Id.* However, a negligent misrepresentation claim will fail if the insured has a copy of his or her policy and can see that the alleged oral misrepresentation contradicts the express terms of the policy. *Branscum v. Am. Cmty. Mut. Ins. Co.,* 984 P.2d 675, 680 (Colo. App.1999).

### C. Discussion

¶ 59 Plaintiffs acknowledge that they had full access to their CGL policy. But they argue that this fact is of no consequence because GAB/Hansen is an independent agent, not an insurer. We reject that argument.

¶ 60 In every negligent misrepresentation case, the plaintiff must show justifiable reliance on the alleged misrepresentation. Contrary to plaintiffs' view, we conclude that an insurer's agent should be allowed to assert any relevant fact—including the fact that the insured had access to the policy—to show that the insured's alleged reliance may not have been justifiable.

¶ 61 Nevertheless, we agree with plaintiffs that the court erred in granting summary judgment. Here, the policy terms were not sufficiently unambiguous to defeat, as a matter of law, plaintiffs' assertion of justifiable reliance.

¶ 62 Whether an insurance contract is ambiguous is a question of law that we consider de novo. *Weitz Co. v. Mid-Century Ins. Co.,* 181 P.3d 309, 311 (Colo. App.2007). A term is ambiguous if it is

reasonably susceptible of more than one meaning. *Carlisle v. Farmers Ins. Exch.*, 946 P.2d 555, 556 (Colo.App.1997).

¶ 63 As noted in part III. C, the term "accident" is ambiguous in this context. And the extent of that ambiguity is evidenced by the differing opinions issued by divisions of this court. *See Thompson*, 84 P.3d at 504 ("If there is a split of authority interpreting an insurance policy provision, then the provision may be ambiguous."); *cf. U.S. West Communications, Inc. v. City of Longmont*, 948 P.2d 509, 518 n. 4 (Colo.1997) (ambiguity was "evident from the difference between the district court's and [the] court of appeals' interpretations").[3] In light of the ambiguity, plaintiffs' claim cannot be defeated by the fact that they had access to the CGL policy. Plaintiffs may be charged with full knowledge of the policy's terms, but that knowledge does not mean that plaintiffs were unjustified in relying on Hansen's alleged misrepresentations.

### D. Additional Arguments

¶ 64 GAB/Hansen presents three other arguments in support of the court's summary judgment. Two of these arguments were presented to the trial court. One was not. We discuss and reject those arguments here.

### 1. Preserved Arguments

¶ 65 GAB/Hansen argues that summary judgment is proper because (1) the negligent

misrepresentation claim is time barred under section 13–80–102(1)(a), C.R.S.2012, and (2) plaintiffs cannot prove damages.

▮▮▮▮▮ ¶ 66 These arguments were presented in GAB/Hansen's first motion for summary judgment, which the trial court denied. Generally, denial of a summary judgment motion is not appealable. *Lombard v. Colorado Outdoor Educ. Center, Inc.*, 187 P.3d 565, 573 n. 6 (Colo.2008). But we address these arguments here because, on appeal of a summary judgment, "the moving party may abandon the trial court's rationale and assert an alternative theory, supported by the record, to affirm the judgment." *Hunter v. Mansell*, 240 P.3d 469, 474 (Colo. App.2010).

#### a. *Statute of Limitations*

▮▮▮▮▮ ¶ 67 A court may grant summary judgment if the plaintiff's claim is barred by the governing statute of limitations. *See, e.g., Olson v. State Farm Mut. Auto. Ins. Co.*, 174 P.3d 849, 860 (Colo.App. 2007) (affirming summary judgment based on insured's failure to comply within the applicable statute of limitations). But a court cannot grant summary judgment on this basis if there are disputed issues of fact about when the statute of limitations began running. *See, e.g., Stiff v. BilDen Homes, Inc.*, 88 P.3d 639, 641 (Colo.App.2003). A negligence claim does not accrue until the plaintiff discovers or reasonably should have dis-

---

**3.** Other courts view divergent judicial interpretations as indicia of ambiguity. *See Thompson v. Gov't Emps. Ins. Co.*, 122 Ariz. 18, 592 P.2d 1284, 1287 (Ariz.Ct.App.1979) (that various jurisdictions have reached different conclusions about coverage is a strong indication that the policy provisions are ambiguous); *Travelers Indem. Co. v. Summit Corp.*, 715 N.E.2d 926, 938 (Ind.Ct.App.1999) (ambiguity is evidenced by the difference in views about the meaning of an insurance contract); *Giacomelli v. Scottsdale Ins. Co.*, 354 Mont. 15, 221 P.3d 666, 673 (2009) (split in authority over the meaning of policy language is "additional support for concluding that there was ambiguity"); *Cohen v. Erie Indem. Co.*, 288 Pa.Super. 445, 432 A.2d 596, 599 (1981) ("The mere fact that several appellate courts have ruled in favor of a construction denying coverage, and several others have reached directly contrary conclusions, viewing almost identical policy provisions, itself creates the inescapable conclusion that the provision in issue is suscepti-

ble to more than one interpretation."); *Greenville Cnty. v. Insurance Reserve Fund*, 313 S.C. 546, 443 S.E.2d 552, 553 (1994) (differing interpretations of insurance policy language among courts indicates ambiguity); *Murray v. State Farm Fire & Cas. Co.*, 203 W.Va. 477, 509 S.E.2d 1, 9 n. 5 (1998) ("A provision in an insurance policy may be deemed to be ambiguous if courts in other jurisdictions have interpreted the provision in different ways."); *but see Floyd v. N. Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193, 196 (1993) ("[T]he fact that courts in different jurisdictions have reached different results in construing similar policy language does not create an ambiguity, especially when a plain reading of the disputed provision effectuates the intention of the parties."); *Bartel v. Carey*, 127 Wis.2d 310, 379 N.W.2d 864, 866 (Wis.Ct.App.1985) ("The contract is not rendered ambiguous because courts in other states have reached different results in construing similar policy language.").

covered the negligent act and at least some resulting damages. *See, e.g., Smith v. Mehaffy,* 30 P.3d 727, 732 (Colo.App.2000).

¶ 68 Here, until Scottsdale finally denied coverage, plaintiffs could not have discovered that Hansen had been negligent in allegedly misrepresenting the extent of coverage. If that denial occurred in November 2005, when Scottsdale allegedly informed plaintiffs about the lack of coverage, then plaintiffs' claim is untimely. However, if the denial did not occur until Scottsdale's letter of August 2006, then the action is timely. Because there is a disputed issue of fact as to the accrual date, we conclude that summary judgment could not be based on the statute of limitations.

b. *Damages*

¶ 69 GAB/Hansen argues that plaintiffs could not have suffered any damage as a result of Hansen's statements because, when the statements were made, Founders had already insisted that the pool be replaced.

¶ 70 We agree with the trial court that summary judgment cannot be granted on that basis. In his affidavit, Kitowski asserted that he had abandoned negotiations about potential remedies once he was assured of coverage.[4] Moreover, even if Founders would have insisted on replacement, it is far from clear that Kitowski would have been obliged to expend personal funds. Yet the record suggests that Kitowski may have committed personal funds in reliance on Hansen's statements.

2. Unpreserved Argument

¶ 71 GAB/Hansen asserts, for the first time, that reasonable reliance is precluded because Hansen expressed a mere opinion about Scottsdale's legal duty. We reject this argument.

We first explain why we choose to address this argument. If GAB/Hansen's argument constituted an additional *attack* on the court's judgment, we would decline to

address it. *See, e.g., White v. Progressive Mountain Ins. Co.,* 62 P.3d 1074, 1077 (Colo.App.2002) (declining to address a new argument raised in opposition to the summary judgment). But GAB/Hansen's argument is designed to *support* the court's judgment, and it is well established that an appellate court may affirm "for any reason supported by the record, even reasons not decided by the trial court." *Roque v. Allstate Ins. Co.,* 2012 COA 10, ¶ 7 [318 P.3d 1]. We choose to address this new argument because, had it been raised below, "the factual record before us on de novo review—[the deposition testimony and affidavit describing what Hansen allegedly said]—would be the same." *Qwest Corp. v. Colorado Div. of Prop. Taxation,* 310 P.3d 113, 122, 2011 WL 3332876, *10 (Colo.App. No. 10CA1320, Aug. 4, 2011) (*cert. granted* May 29, 2012).

¶ 72 "[T]he tort doctrine of negligent misrepresentation applies only when there has been a misrepresentation of an existing fact...." *High Country Movin', Inc. v. U.S. West Direct Co.,* 839 P.2d 469, 471 (Colo.App.1992). "Expressions of opinion cannot support a misrepresentation claim." *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver,* 892 P.2d 230, 237 (Colo.1995). However, liability for negligent misrepresentation may arise where an opinion involves "mixed statements of law and fact." *Id.*

¶ 73 Contrary to GAB/Hansen's view, we conclude that the alleged statements were not an opinion of law. In our view, the statements could reasonably be interpreted as either (1) a statement of existing fact (the replacement work fell within the policy's scope of coverage), or (2) a mixed statement of fact and law (how Scottsdale's legal obligations applied to the circumstances that Hansen observed). *See Brodeur v. Am. Home Assurance Co.,* 169 P.3d 139, 153 (Colo.2007) ("A statement concerning the law is a misrepresentation of fact if it involves 'statements that imply the existence of accurate and readily ascertainable facts that ei-

---

4. Although Hansen points to some contradictory testimony in Kitowski's deposition, the record does not show such a complete contradiction that we could disregard the affidavit as a sham.

*Cf. Andersen v. Lindenbaum,* 160 P.3d 237, 241 (Colo.2007) (sham affidavit determination subject to de novo review).

ther concern the law or have legal significance, but which are not part of the law themselves.'") (quoting *Equal Justice Found. v. Deutsche Bank Trust Co.*, 412 F.Supp.2d 790, 795–96 (S.D.Ohio 2005)).

## V. Conclusion

¶ 74 The summary judgments are reversed, and the case is remanded to the trial court for further proceedings on plaintiffs' claims against defendants.

Judge WEBB and Judge FURMAN concur.