**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 2, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————

ROCKY MOUNTAIN PRESTRESS, LLC,

    Plaintiff - Appellant,

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

    Defendant - Appellee.

No. 19-1169

————————————————

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-03167-RPM)**
————————————————

Melissa R. Liff (Dennis B. Polk with her on the briefs) of Holley, Albertson & Polk, P.C., Lakewood, Colorado, for Plaintiff–Appellant.

Nicole K. Gorham (Brian J. Spano and Amy D. Wills with her on the brief) of Lewis Roca Rothgerber Christie LLP, Denver, Colorado, for Defendant–Appellee.
————————————————

Before **HARTZ** and **EID**, Circuit Judges.[*]
————————————————

**HARTZ**, Circuit Judge.
————————————————

---

[*] The late Honorable Monroe G. McKay, United States Senior Circuit Judge, heard oral argument and participated in the panel's conference of this appeal, but passed away before its final resolution. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See United States v. Wiles*, 106 F.3d 1516, 1516, n* (10th Cir. 1997); 28 U.S.C. § 46(d).

The subcontractor on a building project seeks coverage under the property owner's insurance policy for the subcontractor's costs of repairing its faulty work. The district court granted summary judgment in favor of the insurance company on three independent grounds: (1) the subcontractor had not shown that the claimed loss was fortuitous; (2) the claimed loss did not constitute "direct physical loss or damage" as required for coverage under the policy, Aplt. App., Vol. I at 254; and (3) even if there might otherwise have been coverage, the claimed loss fell within the policy's exclusion for defective workmanship. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court's decision based on the defective-workmanship exclusion.

## I. BACKGROUND

Colorado Center Development, LLC, the owner of certain property in Denver, Colorado, hired J.E. Dunn Construction Company to construct an office building (the Project) on the property. Colorado Center purchased from Defendant Liberty Mutual Fire Insurance Company a Builder's Risk insurance policy (the Policy). The Policy provides protection against "direct physical loss or damage caused by a covered peril to 'buildings or structures' while in the course of construction, erection, or fabrication." Aplt. App., Vol. I at 254. It defines covered perils as "risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded." *Id.* at 263. (Policies that cover "any fortuitous loss not resulting from an excluded risk or from fraud by the insured" are often referred to as "all-risk" policies. *Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 774 (10th

2

Cir. 1989).) One of the Policy's exclusions is for "loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to . . . design, specifications, construction, materials, or workmanship." *Id.* at 265. This exclusion is itself subject to an exception: "[I]f an act, defect, error, or omission as described above results in a covered peril, [Liberty] do[es] cover the loss or damage caused by that covered peril." *Id.*

General contractor J.E. Dunn hired plaintiff Rocky Mountain Prestress, LLC (RMP) as a subcontractor to perform work including "engineer[ing], supply[ing,] and install[ing] all precast concrete components, connections, and erections aids" and "[s]upply[ing] and install[ing] grout and/or patching of all connections required by the engineering for the structural integrity of the precast." Aplt. App., Vol. I at 125–26. RMP began erecting precast columns at the site on February 1, 2016, finishing this work on June 10, 2016. But because of "potential concerns that arose at another project" relating to "sinking pillars/columns," J.E. Dunn requested RMP to retain a third-party engineering firm to investigate "potential structural issues" with RMP's work on the Project. *Id.* at 376. The engineering firm concluded that the Project required "repairs to insufficiently grouted joints between precast concrete column and pilaster elements" at 264 locations throughout the structure. *Id.* at 325. It submitted a plan detailing the regrouting repairs that would be required at the various faulty joints. It did not note any other structural issues with the Project or describe any other repairs that would be needed. The engineering firm began its investigation in August 2016, and the final grouting repair work was completed in February 2017.

In the meantime, in November 2016, RMP submitted a claim to Liberty seeking coverage under the Policy.[1] Liberty's loss-investigation notes from November 2016 reflect the difficulty it experienced in attempting to gather more information about the nature and basis of RMP's claim. On January 3, 2017, a Liberty loss investigator summarized his understanding of the claim:

> In review of the documents submitted the damage deals with sinking pillars/columns. The investigation by the structural engineering firm was requested by [RMP] and was "based on potential concerns that arose at another project and at the request of JE Dunn". The . . . report [by the third-party] structural engineer[] indicates "insufficiently grouted joints between precast concrete column and pilaster elements" are being investigated. The joints are being shimmed and regrouting repairs appear to be underway. The plans that have been provided indicate that there are 264 locations throughout the structure that are being addressed.

*Id.* at 321.

In March 2017 the loss investigator traveled to Denver to inspect the building himself. The appellate appendix prepared by RMP contains no indication of any further activity by either party on the claim until December 2017, when RMP filed a lawsuit in Colorado state court against Liberty. The appendix also contains no indication that the Project required any repairs other than the regrouting remediation work recommended by the third-party engineering firm.

In its complaint RMP raised four claims for relief: (1) breach of contract, (2) insurance bad faith, (3) statutory damages for insurance bad faith, and (4) declaratory judgment on the question of insurance coverage. Liberty removed the action to the

---

[1] Liberty contends that RMP was not an additional insured under the Policy. But we need not resolve that issue because the Policy does not cover the loss anyway.

4

United States District Court for the District of Colorado based on diversity jurisdiction.

Following written discovery, Liberty filed a motion for summary judgment. RMP opposed the motion on the merits; it did not request additional time for discovery or inform the court under Fed. R. Civ. P. 56(d) that it was unable to present facts essential to its opposition. The district court agreed with Liberty that RMP's claimed loss from the regrouting remediation work was not entitled to coverage under the terms of the Policy and accordingly granted summary judgment in favor of Liberty.

## II. DISCUSSION

"We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (internal quotation marks and brackets omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this test, "we consider the evidence in the light most favorable to the non-moving party." *Tesone*, 942 F.3d at 994 (internal quotation marks omitted). For there to be a "'genuine'" dispute of fact, "there must be more than a mere scintilla of evidence"; "[t]o avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). Thus, "unsupported and conclusory statement[s] . . . , even from experts,

5

are insufficient to defeat summary judgment," *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F. 3d 967, 977 (10th Cir. 2018), and "[s]ummary judgment may be granted if the evidence is merely colorable or is not significantly probative," *Vitkus*, 11 F.3d at 1539.

The parties agree that this diversity case is governed by the substantive law of Colorado. When Colorado law has not addressed the specific issue before us, our task is to predict how the Colorado Supreme Court would rule. *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930–31 (10th Cir. 2018). To make this prediction, we may look to "lower state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Id.* (brackets and internal quotation marks omitted). "A federal district court's state-law determinations are entitled to no deference and are reviewed de novo." *Id.* at 931 (internal quotation marks omitted).

Under Colorado law, "[a]n insurance policy is merely a contract that courts should interpret in line with well-settled principles of contract interpretation." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). One of these well-settled principles is the rule that "a court should seek to give effect to all provisions so that none will be rendered meaningless." *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 933 (Colo. 1999) (internal quotation marks omitted). "In undertaking the interpretation of an insurance contract, courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy." *Cyprus*

6

*Amax*, 74 P.3d at 299. "However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." *Id.* "Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1091 (Colo. 1991). Although an ambiguous term must be construed broadly in favor of the insured, this "does not mean that we must adopt [the insured's] views wholesale." *Colo. Pool Sys., Inc. v. Scottsdale Ins. Co.*, 317 P.3d 1262, 1270 (Colo. App. 2012). "On the contrary, we must ensure that any interpretation of [the ambiguous term] comports with the policy's remaining provisions." *Id.*

The insured bears the initial burden of demonstrating coverage under the policy. *See Rodriguez ex rel. Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991). The burden then shifts to the insurer to prove the applicability of an exclusion from coverage; if the insurer makes this showing, the burden shifts back to the insured to show an exception to any coverage exclusion. *See id.*

The Policy contains an exclusion for "loss or damage consisting of, caused by, or resulting from an act, defect, error, or omission (negligent or not) relating to[] design, specifications, construction, materials, or workmanship." Aplt. App., Vol. I at 265. RMP does not dispute that the loss it claims here consists of or resulted from a defect in the workmanship or materials it used in grouting the joints of the precast concrete elements it installed at the Project. Nevertheless, RMP argues that coverage is restored by the resulting-loss exception to this exclusion, which provides: "[I]f an

7

act, defect, error, or omission as described above results in a covered peril, [Liberty] do[es] cover the loss or damage caused by that covered peril." *Id.* RMP points out that *covered peril* is defined as a risk of loss or damage that is not caused or limited by an "excluded" peril, *id.* at 263, and it argues that the Policy's language is thus circular, inconsistent, and ambiguous, requiring this court to interpret the Policy in favor of coverage for all of RMP's costs of remediating its faulty workmanship.

The case law does not support RMP. Several courts have concluded that the above-quoted and similar resulting-loss exceptions function to restore coverage only "when an excluded peril leads to loss from an independent non-excluded peril." *KAAPA Ethanol, LLC v. Affiliated FM Ins. Co.*, 660 F.3d 299, 302 n.1 (8th Cir. 2011) (internal quotation marks omitted). For instance, in *Viking Construction, Inc. v. 777 Residential, LLC*, 210 A.3d 654, 658 (Conn. App. Ct. 2019), a Connecticut appellate court considered an identical resulting-loss exception in a Liberty Builders' Risk policy that excluded damages for losses caused by renovation work. The court rejected the insureds' argument that the resulting-loss exception restored coverage for damages sustained when the windows of a building were inadvertently sprayed with a harmful cleaner during the course of renovation. *Id.* at 657, 665. The court reasoned that this exception comes into play only when there are at least two causes of a loss, one covered and one excluded:

> On the basis of the plain language of the resulting loss clause in the present case, a loss caused by an act during a renovation will be covered if the act causes a covered peril, such as a fire, and that latter peril damages the building. In the present case, there was only one cause of the [insureds]' loss—the spraying of the building, which caused damage to the windows—

8

> and because that was not a covered peril, the resulting loss clause does not apply.

*Id.* at 665. In support of this conclusion, the Connecticut court cited favorably an unpublished decision from this court applying Colorado law, s*ee id.* at 666, in which we affirmed the district court's interpretation of a resulting-loss exception as "provid[ing] for coverage only when the excluded cause . . . becomes a new causal agent that itself causes resultant property damage," *Travelers Indem. Co. v. Bd. of Cty. Comm'rs*, 508 F. App'x 733, 734–35 (10th Cir. 2013) (internal quotation marks omitted).

Likewise, the district court in *Balfour Beatty Construction, LLC v. Liberty Mutual Insurance Co.*, 366 F. Supp. 3d 836, 845 (S.D. Tex. 2018), concluded that an identical exception in a Liberty Builders' Risk policy would come into play only if there were "at least two loss events." The court explained: "Since a peril cannot be simultaneously excluded and covered, the clause must be referring to two separate perils, one excluded and one covered." *Id.* Thus, in the case before the court, where molten metal particles from the operations of a welding subcontractor on a building fell down the side of the building and damaged windows on the building, *see id.* at 838, the window damage was not covered by the policy because the claimed loss was based solely on the excluded peril of defective construction, *see id.* at 845. The court noted that its interpretation of the policy did not render impotent the exception to the exclusion. "If 'an act, defect, error, or omission (negligent or not) relating to construction' caused holes in the windows, and a subsequent rainstorm caused water

9

to enter through the holes and damage the interior finishes, then there would be an excluded peril (the act relating to construction) resulting in a covered peril (water entering through the holes and damaging the interior)." *Id.* at 845–46 (ellipsis omitted).

To be sure, courts have not been entirely consistent in their interpretations of similar resulting-loss exceptions, but not in any way helpful to RMP. For instance, one line of cases holds that there is coverage only if the first, excluded cause results in a separate, covered cause in an unforeseeable way, as when a water leak caused by defective construction shorts an electrical socket and causes a fire, but not when the second cause is the foreseeable result of the first, excluded cause, as when defective construction causes a water leak that in turn causes water damage. *See TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 579 (6th Cir. 2010) (holding that the role of the resulting-loss exception is to prevent the insurer from "avoid[ing] coverage for losses remotely traceable to an excluded cause," but not to cover foreseeable results of the excluded cause). Other courts have suggested that there only needs to be a separate, intervening cause, regardless of its foreseeability. *See, e.g.*, *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 507 (5th Cir. 2000) (noting that an all-risk policy would cover damages sustained when insufficiently secured arches blew down in wind, as wind was an intervening cause that combined with defective workmanship to trigger damage); *see also GTE Corp. v. Allendale Mut. Ins. Co.*, 372 F.3d 598, 614 n.18 (3d Cir. 2004) (describing different approaches to this issue but declining to resolve dispute because insured was not entitled to coverage under either

10

interpretation). Still others have discerned no need to address how unforeseeable or separate the second cause must be to trigger coverage under the exception. *See, e.g.*, *Travelers*, 508 F. App'x at 734–35. Finally, some courts have interpreted certain resulting-loss clauses to permit coverage for any damage that results from defective workmanship, even if there is no "separate" and "independent" cause, so long as the claimed loss is not the defective workmanship itself. *See, e.g.*, *Leep v. Trinity Universal Ins. Co.*, 261 F. Supp. 3d 1071, 1084–85 (D. Mont. 2017); *Kesling v. Am. Family Mut. Ins. Co.*, 861 F. Supp. 2d 1274, 1282–84 (D. Colo. 2012).

Regardless of how broadly courts interpret "resulting" losses under such exceptions, however, they are all in agreement on one overarching principle: the exception cannot be allowed to swallow the exclusion. Thus, a resulting-loss exception to a defective-workmanship exclusion does not provide coverage for the costs of repairing or replacing defectively designed or constructed parts of a structure; rather, the exception only restores coverage for damage sustained when the defective workmanship becomes the cause of additional, separate damage. *See, e.g.*, *Travelers*, 508 F. App'x at 734–35 (affirming district court's conclusion that damage to roof structures from a combination of construction defects and snow weight was not covered by resulting-loss exception because the claimed loss was damage to the defectively constructed roof itself, rather than damage to other property caused by the defective roof); *Alton Ochsner*, 219 F.3d at 507 ("As a matter of perspective we must remain mindful that the policy does not cover the costs of 'making good' defective construction. For example, if shoddy plumbing work caused pipes to break and a

11

building to flood, damaging the carpet, the policy would cover the cost of replacing the carpet but not the cost of repairing or replacing the shoddy plumbing job." (footnote omitted)); *Leep*, 261 F. Supp. 3d at 1082–85 (finding ambiguity in question of whether resulting damage must be separate and independent from excluded cause, but noting that excluded cause itself would not be covered: "If, for example, the entire roof had been improperly installed in this case, and remediation required the complete tear-off and reinstallation of the roof," *id*. at 1084, then this substantial remediation cost would be excluded regardless of the resulting-loss exception); *Kelsing*, 861 F. Supp. 2d at 1282–84 (holding that costs to repair or replace defective deck, roof, and crawlspace were not covered by policy because restoring coverage for these costs would permit exclusion to swallow the exception; exception only covered "damage to [other] parts of the home . . . resulting from water or moisture infiltration resulting from the defective construction," *id*. at 1284). *See generally* 11 Steven Plitt et al., Couch on Insurance (3d ed. Rev. 2017) § 153:2, p. 153-11 n.8 ("Ensuing loss clauses ensure that if one of the specified uncovered events takes place, any ensuing loss which is otherwise covered by the property insurance policy will remain covered; the uncovered event itself, however, is never covered.").

We are persuaded that Colorado would likewise conclude that the insurance policy in this case cannot be interpreted in a way that would permit the exception to swallow the exclusion. RMP provides no reasonable interpretation by which the resulting-loss exception's restoration of coverage for "loss or damage caused by [a] covered peril" that "results" from excluded defective workmanship, Aplt. App., Vol.

12

I at 265, could somehow turn the excluded defective workmanship itself into a covered peril. A covered peril by definition is a peril that is not excluded, and thus by definition defective workmanship is not a covered peril, even if it may trigger a covered loss as a new causal agent or in combination with another cause. If defective workmanship were considered an exception to the exclusion for defective workmanship, then this entire provision would be rendered superfluous, contrary to basic principles of contract interpretation. *See Pub. Serv. Co.*, 986 P.2d at 933. By contrast, Liberty's suggested interpretation of this provision—that coverage may be extended to other property damage that results from defective workmanship, but not to the defective workmanship itself—is a reasonable interpretation that gives effect to all the policy's provisions and is consistent with the decisions of numerous other courts that have considered identical or similar provisions.

Although courts may differ on the question of how unforeseeable and separate any resulting damage must be for the resulting damage to be covered, there is no ambiguity on the question of whether the excluded defective workmanship can itself be counted as covered resulting damage. *See Leep*, 261 F. Supp. 3d at 1082–85; *see also Hecla*, 811 P.2d at 1091 ("Terms used in a contract are ambiguous when they are susceptible to more than one *reasonable* interpretation." (emphasis added)). Accordingly, RMP cannot receive coverage under the policy for its costs of

13

regrouting and otherwise repairing the joints that were not properly grouted in the first instance.[2]

RMP contends that it is nevertheless entitled to coverage for at least some amount of loss because the insufficiently grouted joints resulted in other damage to the Project. But the only evidence RMP cites in support of this argument is the statement made by Liberty's loss investigator, summarizing his understanding of the claim materials he had received from RMP, that "the damage deals with sinking pillars/columns," that "potential concerns that arose at another project" had given rise to an investigation into "insufficiently grouted joints" at the Project, and that "regrouting repairs appear to be underway." Aplt. App., Vol. I at 321 (internal quotation marks omitted). RMP contends that this statement proves that the Project sustained damage outside of the defective joints themselves, thus entitling RMP to coverage under the resulting-loss exception.

We conclude that the loss investigator's brief, unclear reference to sinking pillars or columns is not substantial enough to create a genuine dispute of material fact on this issue. First, the loss investigator had no firsthand knowledge of the matter; he was simply summarizing his understanding of the materials he had received from RMP, and these materials themselves do not indicate that there was any sinking of pillars or columns at the Project but rather indicate only that sinking at

---

[2] RMP's reliance on *Adams-Arapahoe* as contrary authority is misplaced. In that case defective design or construction was a covered risk under the policy. *See* 891 F.2d at 777.

14

other projects had triggered an investigation into RMP's work at the Project. Second, this brief reference to sinking pillars and columns is conclusory and unsupported by any details or other facts in the record. *See Roberts*, 884 F. 3d at 977. Finally, even if a jury could somehow rely on this conclusory, vague statement as evidence that pillars or columns were sinking at the Project, RMP has not presented any evidence from which a jury could find that this supposed sinking caused RMP to incur an actual loss outside of the costs of repairing its own defective workmanship at the insufficiently grouted joints. Indeed, the loss investigator's statement relied on by RMP itself indicates that the only repairs were to the joints. Likewise, the third-party engineering firm's report detailed problems with the joints and explained the repairs that would be required for each joint, but it did not note any other problems or recommend any other repairs. And RMP has provided no invoices or other evidence of costs it incurred in repairing anything other than the joints. As noted by the district court, RMP's failure to provide supporting evidence is particularly significant because, "as the contractor who made the repairs, RMP should be in possession of evidence regarding the extent to which the columns were in fact sinking." Aplt. App., Vol. II at 566. Thus, all the specific evidence in the record points to one conclusion: RMP's claimed loss was based solely on its costs of remediating its own defective workmanship. The lone piece of evidence RMP relies on to establish a genuine dispute of material fact—the loss investigator's single, unclear reference to "sinking pillars/columns," Aplt. App., Vol. I at 321—is simply not substantial or probative enough that it could sustain a jury verdict in RMP's favor. At best, this

15

evidence was "merely colorable." *Vitkus*, 11 F.3d at 1539. The district court did not err in granting summary judgment in favor of RMP.

Finally, RMP argues that if it did not present sufficient evidence of resulting damage to other parts of the Project, then this is only because it did not have a sufficient opportunity for discovery before the district court granted summary judgment. This argument fails because RMP did not invoke Rule 56(d) to seek additional time for discovery below. Under Rule 56(d), a party that cannot yet "present facts essential to justify its opposition" may ask the court to deny or defer ruling on a summary-judgment motion, to grant additional time for discovery, or to order other appropriate relief. Fed. R. Civ. P. 56(d). But "Rule 56(d) is not self-executing. A party must invoke it." *Jones v. Secord*, 684 F.3d 1, 6 (1st Cir. 2012). Although summary judgment "should be refused" under Rule 56(d) "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition," we have emphasized that "this protection arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1376 (10th Cir. 1988) (brackets and internal quotation marks omitted). A nonmovant opposing a summary-judgment motion must either demonstrate a genuine dispute of material fact "in a timely fashion" "or explain why it cannot pursuant to Rule 56([d])." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998). "Otherwise, the nonmovant acts, or fails to act, at its peril." *Id.* RMP failed to invoke Rule 56(d) at its peril. Because RMP did not alert the district court to this

16

possible discovery issue below, we hold that the court did not err in granting summary judgment based on the evidence and arguments presented to it by both parties. *See Dreiling*, 850 F.2d at 1376–77.

In sum, RMP points to no evidence from which a reasonable jury could find that it sustained a loss beyond its costs of repairing its own faulty workmanship in the grouting of joints. This claimed remediation loss unambiguously falls within the Policy's exclusion for defective workmanship, and the Policy's resulting-loss exception does not restore coverage for this expressly excluded cause; any contrary interpretation would contradict the terms of the Policy and permit the exception to swallow the rule. Because we affirm the district court's summary-judgment ruling on this basis, we need not address Liberty's alternative arguments for affirmance.

## III.    CONCLUSION

We **AFFIRM** the district court's entry of summary judgment in favor of Liberty.