**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**December 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

JUSTIN BERBERICH,

    Plaintiff - Appellant,

v.

THE KANSAS CITY SOUTHERN
RAILWAY COMPANY,

    Defendant - Appellee.

No. 24-3154

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:22-CV-02426-EFM)**
_____

Charles A. Delbridge (Nicholas D. Thompson, on the briefs) of Casey Jones Law, Minneapolis, Minnesota, for Appellant Justin Berberich.

Courtney J. Harrison (Douglas R. Dalgleish and Anna Turner, with her on the brief), of Stinson LLP, Kansas City, Missouri, for Appellee Kansas City Southern Railway Company.

_____

Before **HARTZ**, **TYMKOVICH**, and **FEDERICO**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiff Justin Berberich was employed as a conductor by the Kansas City Southern Railway Company (KCSR). He appeals the summary judgment in favor of KCSR on his claim of improper retaliation under the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109(b)(1)(B). That statutory subparagraph prohibits discriminating against an employee for engaging in protected activity—namely, "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties," § 20109(b)(1)(B), if, among other things, the hazard presents an imminent danger.[1]

Plaintiff's alleged protected activity was to perform a procedure for maneuvering train cars in violation of a "standing order" requiring the train's engineer to perform that task instead. Aplt. Br. at 6. He claims that he was fired for the alleged violation. The district court granted summary judgment on the ground that there was no evidence that the person who fired him knew of this "protected

---

[1] To be precise:

> A refusal is protected under paragraph (1)(B) . . . if—
> (A)  the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;
> (B)  a reasonable individual in the circumstance then confronting the employee would conclude that—
>    (i)   the hazardous condition presents an imminent danger of death or serious injury; and
>    (ii)  the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and
> (C)  the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work[] . . .unless the condition is corrected immediately . . . .

49 U.S.C. § 20109(b)(2).

2

activity," so there could not have been any retaliation. *See Berberich v. Kan. City S. Ry. Co.*, No. 2:22-CV-002426-EFM-TJJ, 2024 WL 521373, at *5–6 (D. Kan. Feb. 9, 2024).

Without reviewing that ground, we affirm the summary judgment on the alternative ground that Plaintiff did not engage in a protected activity. *See Wise v. DeJoy*, 71 F.4th 744, 751 (10th Cir. 2023) ("[W]e have discretion to affirm on any ground adequately supported by the record"). He has failed in three independent ways to establish his claim of a protected activity: (1) there was no evidence of the alleged standing order at the time of his action, (2) there was no evidence that he refused to work, and (3) there was no evidence of a safety hazard at that time. Because Plaintiff has not shown that he engaged in a protected activity, he cannot establish a prima facie case of retaliation under § 20109. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212 (10th Cir. 2018).

### I.    BACKGROUND

#### A.    The Alleged Standing Order

As a conductor, Plaintiff helped assemble freight trains at KCSR's Knoche railyard in Kansas City, Missouri. To perform that task, conductors often work outside at the rear of the train to connect one train car to the next. Conductors are also responsible for diverting or reorienting train cars when necessary, which they do by "throwing" or "lining" a mechanical device, known as a switch, that guides trains from one track to another. Hadar Safar et al., U.S. Dep't of Transp., *Why Do Passenger Trains Run Through Switches in the Rail Yard?* at 92 (2019),

3

https://railroads.dot.gov/sites/fra.dot.gov/files/fra_net/19035/RTS.pdf

[https://perma.cc/LZ5K-7MJM].[2] This process can cause delays because the

conductor must travel from the rear to the front of the train (which can be a

significant distance), line the switch, and then travel back. Plaintiff claimed that

KCSR would try to shortcut this process by instructing engineers, rather than

conductors, to line switches. This would save time because the engineers work inside

the cab at the front of the train and are usually closer to the switch.

According to Plaintiff, it was dangerous to have engineers line switches

because the engineer would need to leave the train's controls unattended to do so. He

acknowledges that the engineer could engage the airbrakes but says that the airbrakes

do not by themselves provide adequate protection. KCSR's own rules instruct

employees not to "depend on the airbrakes to hold a train, engine or cars in place

when left unattended." Aplt. App., Vol. I at 13.

Nevertheless, Plaintiff claims that there was a "standing order" requiring

engineers to line switches. Aplt. Br. at 5. The problem for Plaintiff, however, is that

the record contains no evidence to support the existence of a "standing order"—at

least not in the sense of *an order that is always in effect*.

---

[2] Switches are used to move rail cars onto separate tracks to make up or break up trains. *See* Safar et al., *supra*, at § 1.1.1. Some switches are manual, also known as "hand-thrown." *Id.* A switch is "lined" when it is aligned "with the appropriate track for a particular direction of movement." *Id.* at § 1.1.2, n.1.

The term *standing order* first appears in the record in questions to Plaintiff from his counsel during direct examination at an Occupational Safety and Health Administration (OSHA) hearing before an administrative law judge (ALJ):

> Q.  Did it ever come to your attention that there was a standing order at the Knoche Yard that engineers should abandon their locomotives and throw a switch in order to expedite a move?
>
> A.  Oh, they sure insist on doing it if the engineer would let them get away with it.

Aplt. App., Vol. II at 460.

> Q.  The standing order at the Knoche Yard, was that to tie down trains and then throw the switch, or just having the engineer throw the switch while the train is not tied down?
>
> A.  Just get out and lock the switch.

Aplt. App., Vol. II at 462.

> Q.  Did you know at [the time of the incident] there was a standing order in the Knoche Yard to have the engineer throw that switch?
>
> A.  Yes.

Aplt. App., Vol. II at 463–64.

Plaintiff, however, never uttered the term "standing order," and his attorney did not provide a definition. Critically, when Plaintiff discussed the term on cross-examination, he described something quite different from *an order always in effect*. The following exchange during cross-examination clarifies that what he meant was that his supervisor, Mike Pollard, on occasion would order the engineer, rather than the conductor, to line switches:

5

Q.    Did I hear on direct examination, did you say something to this effect, there was some type of standing order in Knoche Yard that engineers were to line switches?

A.    There was a lot of ordering going on from Pollard telling engineers to get off and line switches when their conductors were back, 50, 60 cars back, to line that switch to expedite a move, expedite movements.

Q.    Well, I want to make sure I understand what was meant by that. Are you saying there's some sort of written, like, superintendent's bulletin or any sort of thing in writing saying we want engineers to line switches, not conductors?

A.    I don't know if there's any bulletins like that, but it just – there was a lot of radio chatter with Mr. Pollard telling engineers to get off their engines and line that switch.

Q.    Got it. You overheard Mr. Pollard on occasion tell other engineers to line switches.

A.    Yes. Or engineers would tell me that Pollard come up here wanting me to line that switch.

Q.    So when you were referring to a standing order in Knoche Yard, really what you were referring to was just that, that Mr. Pollard would order engineers to line switches in particular circumstances; is that right?

A.    As far as I can recall, yes.

Aplt. App., Vol. II at 567–68. Such ad hoc instructions are hardly *standing* orders.

Plaintiff's description was supported by one of his own witnesses. On direct examination, Jeffrey Spigarelli, a KCSR engineer, testified as follows:

Q.    Do you know whether in 2018 and early 2019, Mike Pollard was instructing employees in the Knoche Yard, to expedite a move, they should have the engineer throw the switch instead of the conductor?

> A.    Yes.
>
> Q.    How do you know that?
>
> A.    I have heard him on the radio with the trains when the conductors or engineers would stop at a switch and they had the, "Conductor So-and-So, I need the switch out here in front of me lined."

Aplt. App., Vol. II at 383–84. Again, this is not a description of a standing order, but of an order given on specific occasions.[3]

---

[3] We note that on redirect examination of Plaintiff, his attorney recharacterized these instructions as a "preference" as opposed to a "standing order":

> Q.    Did you know whether there was a preference from managers at the Knoche Yard regarding whether engineers throw switches when it would expedite a move?
>
> A.    Oh, absolutely.
>
> Q.    And what was the preference?
>
> A.    To expedite the move, if it required to have the engineer get off, leave the control stand, don't take any precautions of securing that or anything, you just get down there and line the switch to get that train moving.
>
> Q.    Did you know that was the preference at the time you made the decision to tell the engineer to stay in the cab and you were going to go throw the switch?
>
> A.    Absolutely.

Aplt. App., Vol. II at 590. Plaintiff's briefs on appeal do not cite this exchange in support of his claim that there was a standing order, or for any other purpose for that matter. We therefore decline to consider it. *See Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) ("It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made"); *Gross v.*

### B.    Plaintiff's Alleged Protected Activity

Plaintiff claims on appeal that he defied the alleged standing order in January 2019, when he "refused to let an engineer throw the switch due to his 'safety concern,' insisting on following the correct protocol and walking the significant distance from the rear of the train to the front to throw the switch himself." Aplt. Br. at 6. But there is no evidence in the record that the engineer had been instructed to throw the switch or that there was any risk that the engineer would do so. Though Plaintiff's brief on appeal implies that he prevented the engineer from lining the switch, no witness testified that the engineer on board that day intended to line the switch or would have done so had Plaintiff not stepped in. At his deposition Plaintiff described the incident as follows:

> I was – I believe I was working a QKCSH and we were getting our – getting the train together there in Knoche yard and doubling it up and there was a switch against the engineer up ahead of him on, I believe, the north main. And me being a conductor, that's my job to handle all switches. I – he told me on the radio that there was a switch aligned against him and I responded and said, well, I'll be there as soon as I can. I hollered at the tower and asked for a yard cab which was not available, so I proceeded to walk to the head end to line that switch, line it, and come back to proceed to finish doubling up my train and go from there.

---

*Burggraf Const.* Co, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury" (internal citation omitted)). And, alternatively, even were we to consider it, this testimony merely underscores the ad hoc nature of the alleged "standing order"— "*when it would expedite a move*," management preferred for engineers to line switches. Aplt. App., Vol. II at 590 (emphasis added).

Aplt. App., Vol. I at 88. When asked whether he told the engineer not to line the switch, Plaintiff responded "I don't believe I told him that. He just – it's pretty much just common practice a conductor is going to line the switch." Aplt. App., Vol. I at 89.[4] Thus, there was no evidence that Plaintiff was acting to *keep* the engineer from lining the switch. On the contrary, the testimony was that the engineer called Plaintiff to advise him that he, Plaintiff, needed to come up to line the switch.

---

[4] Plaintiff testified somewhat differently at the administrative hearing. On direct examination he said:

> Q.    . . . [W]hose call was it that day for you to line the switch?
>
> A.    It is mine.
>
> Q.    Did you tell that to your engineer?
>
> A.    Yes.

Aplt. App., Vol. II at 464. And on redirect examination he confirmed that nobody ordered that the engineer line the switch:

> Q.    Well, whatever day that was, no manager came out there and ordered you to have the engineer throw a switch, right?
>
> A.    Not ordered me, but I knew – being up there working enough, I knew what was going to happen about have that engineer line that switch, and I just proceeded to do my job and just go above – just kind of go over them and around them or whatever you're saying, go do what I needed to do because I felt that it was a safety issue.

Aplt. App., Vol. II at 589. We decline to consider the redirect testimony because it is not referenced in Plaintiff's appellate briefs. See *Cordova*, 569 F.3d at 1191; *Gross*, 53 F.3d at 1546. But even if we did consider all this testimony, it suggests only that Plaintiff anticipated, based on prior experience, that management would have preferred for the engineer to line the switch. And there is no evidence that the engineer on board also believed this, let alone that he planned to line the switch.

In other words, Plaintiff was merely doing his job (that is, working), not taking an extraordinary step necessary to prevent a dangerous action.

Plaintiff testified that soon after he returned from lining the switch, he was approached by a manager who told him he was "going to get [him] for delaying the trains." Aplt. App., Vol. II at 465. According to Plaintiff, this manager told him that he had "Pollard breathing down [his] neck, screaming up there in the tower, and [Pollard] wanted [him] to come down here and talk to [Plaintiff]." Aplt. App., Vol. II at 466. What was absent from this account is any mention by the manager of the manner in which Plaintiff had allegedly delayed the trains (by deciding to line the switch, by being dilatory in lining the switch, by doing or not doing something else?).

### C.    Plaintiff's Termination

In February 2019 Pollard observed Plaintiff leaning on a rail car for roughly 40 seconds, a violation of KCSR's safety rules. After a disciplinary hearing he was terminated by a general manager named Chad Devenney. KCSR maintains that under its disciplinary matrix Devenney had no choice but to terminate Plaintiff because of his prior infractions. Plaintiff counters that after he defied the alleged standing order KCSR began "bird dogging" him—that is, carefully monitoring him to try to catch him committing an offense for which he could be terminated. Aplt. Br. at 8 n.1.

As evidence that Devenney knew about his alleged protected activity, Plaintiff points to testimony from Spigarelli. Spigarelli testified that when he was walking down the hallway at KCSR's depot in Pittsburg, Kansas, he overheard Devenney on the phone with Pollard. Aplt. App., Vol. II at 385. According to Spigarelli, Devenney

10

said, "We need to do something about [Plaintiff] and take care of this situation," Aplt. App., Vol. II at 385, and "I am tired of hearing [Plaintiff's] name come up on trains on the law." Aplt. App., Vol. II at 385. (The ALJ explained that "'[t]rains on the law' refers to trains where the crew comes up on the 12-hour cap on [consecutive] daily work hours imposed by the Hours of Service Act." Aplt. App., Vol. I at 176 n.24 (citing 49 U.S.C. § 21103(a))).

Plaintiff argues that there was also circumstantial evidence that Devenney knew about his protected activity. He contends that one could infer Devenney's knowledge because Devenney frequently talked with Pollard, who was so "incensed by" the January 2019 incident that he went "so far as to send a manager to threaten Berberich with consequences for it." Aplt. Br. at 21. He notes that he was terminated only six weeks after the January 2019 incident. And he says that there were "indications of pretext," including that he was punished disproportionately harshly for leaning on the railcar. Aplt. Br. at 23 (emphasis omitted).

Plaintiff and his union challenged his dismissal before a Public Law Board, an arbitration panel created by the Railway Labor Act, *see* 45 U.S.C. § 153; 29 C.F.R. § 1207.1. The Board concluded that Plaintiff had violated KCSR's safety rules but that dismissal was too severe a punishment, and he was reinstated without backpay. Before he was reinstated Plaintiff filed a complaint with OSHA alleging that KCSR had retaliated against him for his "'reporting of safety concerns, reporting injuries, and insisting on following safety rules.'" Aplt. App., Vol. I at 51.

### D.    The ALJ Proceedings

OSHA dismissed Plaintiff's complaint. Plaintiff timely objected and was granted a hearing before an ALJ. The ALJ dismissed Plaintiff's complaint on several grounds, concluding that "neither Pollard nor any other employee of KCSR 'bird dogged' [Plaintiff] in retaliation for any alleged protected activity in which [Plaintiff] may have participated." Aplt. App., Vol. I at 181–82. He found "no credible evidence that in January 2019 [Plaintiff] refused to allow his locomotive engineer to throw a switch, or that [Plaintiff] was accused of delaying a train[,]" Aplt. App., Vol. I at 182 (emphasis omitted), noting that "[n]o one other than Berberich testified about the alleged [January 2019] incident." Aplt. App., Vol. II at 184. And he found "no evidence that there was a 'standing order' which had been given to conductors which required engineers to always leave their cabs to throw switches." Aplt. App., Vol. I at 186. Rather, the ALJ found "at most" that supervisors "may have occasionally required engineers to throw switches." Aplt. App., Vol. I at 186. The ALJ also concluded that Plaintiff had not proved by a preponderance of the evidence that it would always be dangerous for an engineer to leave the cab to throw a switch.

Further, even if the January 2019 incident had occurred as Plaintiff described it, the ALJ was "unable to identify when Plaintiff *refused to work*." Aplt. App., Vol. I at 225. As the ALJ put it:

> Berberich says that he told his locomotive engineer that Berberich was going to throw the switch ahead of the train, and Berberich then proceeded to walk to the head of the train. When Berberich arrived at the head of the train, Berberich threw the switch. It

cannot plausibly be argued that Berberich "refused to work" when he took these actions.

Aplt. App., Vol. I at 225.

### E.    The District-Court Proceedings

Plaintiff appealed the adverse decision by the ALJ to the Secretary of Labor. But in October 2022, before the Secretary took final action, Plaintiff filed the present lawsuit in the United States District Court for the District of Kansas. *See* 49 U.S.C. § 20109(d)(3) (allowing employee to seek de novo review in district court if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint). Although he alleged that KCSR violated the FRSA by retaliating against him for three separate protected activities, the only one at issue here is his refusal to comply with the alleged standing order in January 2019.[5] Plaintiff argued that this was a protected refusal to work under § 20109(b)(1)(B). *See Berberich*, 2024 WL 521373, at *4.

To establish a claim under § 20109(b)(1)(B), an employee must demonstrate that: "(1) the employee engaged in a protected activity; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Lincoln*, 900 F.3d at 1212. The district court granted

---

[5] Plaintiff also alleged two other protected activities: (1) leaning on the railcar in February 2019 to avoid slipping, and (2) taking time off to participate in the Department of Labor investigation of his complaints. The district court granted summary judgment for KCSR on the first allegation, and a jury rendered a verdict for KCSR on the second. Plaintiff does not pursue either of those allegations on appeal.

summary judgment for KCSR on the second element, concluding that no reasonable jury could find that Devenney knew that Plaintiff had engaged in protected activity. *See Berberich*, 2024 WL 521373, at *5–6. The court said that Spigarelli's testimony was the only evidence in the record that could support any inference that Devenney knew about the switching incident. *See id.* at *5. And, while Spigarelli's testimony was not hearsay, it relied on "multiple layers of speculation" and thus was "unreliable." *Id.* at *6.

On appeal Plaintiff argues that the district court improperly rejected Spigarelli's testimony as speculative and ignored circumstantial evidence that would have allowed him to establish Devenney's knowledge. Plaintiff also argues that the district court improperly limited its inquiry to *Devenney*'s knowledge, ignoring the contention that he was merely a cat's paw. *See EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) ("'[C]at's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action").

But we need not consider these arguments because Plaintiff did not produce adequate evidence that he engaged in a protected activity. *See Lincoln*, 900 F.3d at 1212 (to establish prima facie case, employee must show that he engaged in a protected activity). We affirm summary judgment on that ground. *See id.* at 1180 ("[W]e can affirm on any ground supported by the record, so long as the appellant has had a fair opportunity to address that ground" (internal quotation marks

14

omitted)). In doing so, we address issues that were raised by KCSR both in the district court and in its brief on appeal.

## II.    DISCUSSION

We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. *See Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins.*, 960 F.3d 1255, 1259 (10th Cir. 2020). Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "For there to be a genuine dispute of fact, there must be more than a mere scintilla of evidence; to avoid summary judgment, the evidence must be such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (brackets and internal quotation marks omitted). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

KCSR was entitled to summary judgment because Plaintiff failed to present evidence that he had engaged in protected activity. Though Plaintiff invoked multiple provisions of the FRSA in district court, only one provision is at issue on appeal. Under § 20109(b)(1)(B) a railroad carrier "shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties" provided certain conditions are met. Two essential elements of protected activity were missing: (1) Plaintiff did not refuse to

15

work, and (2) when Plaintiff lined the switch in January 2019 he was not confronting a hazardous safety condition.

### A.    Refusal to Work

Plaintiff claims that KCSR terminated him in retaliation for the alleged protected activity described above. He contends that when he lined the switch himself he had been "refusing to work when confronted by a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(B).

Plaintiff's claim hinges on a distorted construction of the phrase "refusing to work" in § 20109(b)(1)(B). "Statutory interpretation begins with the words in the statute." *Smith v. Bd. of Governors of the Fed. Rsrv. Sys.*, 73 F.4th 815, 820 (10th Cir. 2023) (internal quotation marks omitted). We first determine "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* (internal quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). "If the statute's text is unambiguous, then its plain meaning controls, and our inquiry ends." *Smith*, 73 F.4th at 820 (internal quotation marks omitted).

Plaintiff's theory is that he refused to work in January 2019 when he walked the length of a train to line the switch himself. We fail to see how that activity was "not working," regardless of whether he was violating a standing order that engineers, not

16

conductors, should throw switches. In his August 2021 deposition, Plaintiff testified about the incident as follows:

> Q.    Okay. But what choice did you have then if it's your job to throw the switch and the switch has to be thrown before that train can leave the yard, what is your understanding as to what the manager would had to have done differently?
>
> A.    That's a question – I don't know. I mean, I did what I was supposed to do to protect my job as I was – as it's defined, conductors switch cars, pull pans, line switches, and I did what I – as far as I'm concerned, we both did what we were *supposed to*, took the safe course and I walked up there and lined that switch and came back.

Aplt. App., Vol. I at 89–90 (emphasis added). In May 2022 Plaintiff similarly testified before the ALJ:

> Q.    So now let's talk about an incident that occurred on January 1st or 2nd of 2019. There was an incident where a manager came out and threatened you for delaying a train, right?
>
> A.    Yes.
>
> Q.    Prior to the manager coming out there, will you tell the Court what you were doing?
>
> A.    I was there by the tower at Knoche and I was putting my train together, doubling it up, getting it ready – trying to get it out of the yard to depart to go south.
>
> Q.    Was there a switch that needed to be thrown?
>
> A.    Yes, there was a switch. It was against my engineer. I want to say it was – I want to say it was the water (audio distortion) switch, but I can't remember for sure, but I know there was a switch up ahead of my – ahead of our train that needed to be lined.
>
> Q.    Did you know at that time there was a standing order in the Knoche Yard to have the engineer throw that switch?
>
> A.    Yes.
>
> Q.    On this day, who threw that switch?

17

A.    I did.

Q.    Why?

A.    Because it is my job. I mean, I think I did everything I could. I looked for a – I took the best path that I knew, which was calling for a cab to get a ride to the head-end. And the yardmaster said, "No cab," so I did the next best thing which was to walk up there and line it and visualize the points of the switch were fit properly, and then walk back to where I was trying to double up on my train to leave, and that is where I was met by that manager.

Aplt. App., Vol. II at 463–464.

Plaintiff testified that throwing the switch was what he was "supposed to" do. Aplt. App., Vol. I at 89. He reiterates this on appeal when he explains that the duty of throwing the switch was "assigned to conductors." Aplt. Br. at 4. We decline to interpret "refusing to work" to encompass its exact opposite—working. At best, Plaintiff is equating "refusal to work" with "refusal to work in an unsafe manner required by the employer." But that proposition fails him on both the facts and the law. As for the facts, there is no evidence in the record that when he threw the switch in early January 2019, he was disobeying an order from his superiors. And as for the law, even if he did disobey such an order, he did not engage in protected activity on that account. If that were the intent of Congress, the natural way for it to express this would be to define protected activity to include "refusing to violate known safety standards." And Congress was well aware of that mode of expression. Indeed, in the subsection of § 20109 immediately preceding the subsection at issue here, Congress prohibited retaliation for "refus[ing] to violate . . . any Federal law, rule, or regulation relating to railroad safety." 49 U.S.C. § 20109(a)(2). What Plaintiff would like to do to the statute is expand it from refusals to

18

violate *federal* safety law (as expressly stated in the statute) to encompass violations of other safety standards (as he contends happened here). In our view, that would require improper statutory amendment by the judiciary.

Our reading of the statutory language echoes that of the ALJ, who said that "it cannot plausibly be argued that [Plaintiff] 'refused to work' when he took these actions." Aplt. App., Vol. I at 225.

### B.    Confronting Hazardous Safety Condition

Even if Plaintiff somehow could be said to have refused to work by working, he still could not survive summary judgment because he failed to establish that his actions resulted from his confrontation of a hazardous safety condition. Section 20109(b)(1)(B) protects an employee's refusal to work only if the following conditions are met:

(A)    The refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

(B)    *a reasonable individual in the circumstances then confronting the employee would conclude that—*
   (i)    *the hazardous condition presents an imminent danger of death or serious injury;* and
   (ii)    the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal[.]

§ 20109(b)(2) (emphasis added).

Viewing the evidence in the light most favorable to Plaintiff**,** *see Rocky Mountain Prestress*, 960 F.3d at 1259, no reasonable jury could find that Plaintiff met those conditions. Plaintiff has presented no evidence that he was faced with a potentially hazardous condition posing an "imminent danger of death or serious injury." 49 U.S.C. § 20109(b)(2)(B)(i); *Imminent, Black's Law Dictionary* 894 (12th ed.

2024) (defining *imminent,* in reference to a danger or calamity, as "threatening to occur immediately; dangerously impending").

The hazard identified by Plaintiff that presented an imminent danger was the engineer's leaving his post to line a switch. But Plaintiff had no reason to believe that the engineer was going to line a switch. Even if one could assume that the engineer would follow an order from a superior, we have already pointed out that there was no testimony to support the assertion that there was an official order always requiring the engineer to line a switch. Nor was there any evidence that on this specific occasion the engineer was about to leave his post to line a switch. The deposition testimony of Plaintiff himself contradicted any such notion. He said that the engineer "told [Plaintiff] on the radio that there was a switch aligned against him and [Plaintiff] responded and said, well, I'll be there as soon as I can." Aplt. App., Vol. I, at 88. In response to a question about whether he told the engineer not to line the switch, Plaintiff testified, "I don't believe I told him that" because "it's pretty much just common practice a conductor is going to line the switch." Aplt. App., Vol. I at 89.

## III.    CONCLUSION

Plaintiff did not engage in a protected activity under the FRSA. He did not refuse to work under the plain meaning of § 20109(b)(1)(B). Nor is there a genuine issue of fact as to the imminence and urgency requirements set out in § 20109(b)(2)(B). We **AFFIRM** the district court's grant of summary judgment.